Charles AMATI, et al., Plaintiffs–
Appellants,

v.

CITY OF WOODSTOCK, et al.,
Defendants–Appellees.

Nos. 98–2680, 98–2681.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1999.

Decided May 4, 1999.

James T. Harrison (argued), Harrison Law Offices, Woodstock, IL, for Plaintiffs–Appellants.

Thomas G. DiCianni (argued), Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, for City of Woodstock.

Thomas G. DiCianni (argued), Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, Joseph P. Condon, Condon & Zopp, Crystal Lake, IL, for Pitzman, Beu.

Stephen E. Balogh, III, Williams & McCarthy, Rockford, IL, Thomas G. DiCianni (argued), Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, for Kutz.

Before POSNER, Chief Judge, and CUDAHY and ROVNER, Circuit Judges.

POSNER, Chief Judge.

This is a suit under the federal electronic-eavesdropping statute (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*) against the former police chief of Woodstock, Illinois, and other former members of the Woodstock police department, complaining about the taping of calls on one of the department's telephone lines, (815) 338–7799, between February and October of 1992. (The Title III charge against the City of Woodstock itself was dismissed before trial.) The appeal presents questions, both substantive and procedural, of some novelty.

The plaintiffs, 63 in number, are employees and former employees of the police department, and their friends and family members, who used the line for personal calls not realizing (they say) that the calls were being recorded. A jury brought in a verdict for the defendants, and the plaintiffs appeal. The complaint included, besides the Title III charge, a charge under 42 U.S.C. § 1983 that the defendants had violated the Fourth Amendment (made applicable to state and local governmental action by interpretation of the Fourteenth Amendment), but the plaintiffs do not challenge the part of the verdict that rejected this theory of liability.

Their principal argument is that they were entitled to judgment as a matter of law on the Title III count because the evidence, even when construed as favorably to the defendants as the record will permit, established a violation. The taping was indeed a prima facie violation, see 18 U.S.C. § 2511(1), but the defendants argued, and the jury agreed, that it came within the statutory exclusion of eavesdropping "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). (See § 2510(4) for the connection between § 2511(1), the prima facie violation, and § 2510(5)(a)(ii), the exclusion.) It is routine, standard, hence "ordinary" for all calls to and from the police to be recorded. Such calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance.

Title III also contains an exclusion for interceptions made in the "ordinary course of business." 18 U.S.C. § 2510(5)(a)(i). This is intended for situations in which a business or other entity, presumably one not involved in law enforcement (for otherwise this exclusion would duplicate the one for eavesdropping in the ordinary course of law enforcement), records calls to or from its premises in order to monitor performance by its employees. See, e.g., *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740–42 (4th Cir.1994); *Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir.1992). A possible interpretation of the two closely related "ordinary course" exclusions is that they place beyond the reach of Title III cases in which the subscriber to a telephone line records calls on his line as opposed to intercepting calls on other people's lines. Indeed, the very term "interception" could be thought misplaced when applied to a subscriber's recording calls on his own line. But this interpretation, implicitly rejected in *Sanders* and *Deal*, is not pressed by the defendants, so we lay it to one side.

The Woodstock police department began recording all calls on all its lines in 1982 with the exception of calls on 338–7799, an

unlisted line. A departmental memo that year to the employees explained that this "line was intentionally left untapped to allow for personal calls, however, we request that you keep those calls brief and to a minimum." From time to time in subsequent years departmental memoranda or correspondence referred to the line as not being tapped.

The line was used for business as well as personal calls, particularly calls to and from public agencies and banks. The tapped lines, at the time, emitted a beep, and there was a concern that if such a line were used to acknowledge a call from a bank reporting a bank robbery in progress, the robber would take the call and realize that the robbery had been reported. In May of 1991, a call was made on 338–7799 complaining about a chlorine leak in a city pool. A city councilwoman was dissatisfied with the police department's response to the complaint, but investigation was stymied by the fact that the call had not been recorded. So the department decided to tape record calls on 338–7799. But it did not tell the employees, though many of them may have known about it. The taping was "officially" discovered when one of the defendants, reviewing a tape, heard one of the plaintiffs making derogatory comments about him and complained to the president of the local police union, telling him in the course of their conversation that all calls, including those on 338–7799, were being taped. This suit followed.

■ The plaintiffs argue that wiretapping cannot be "in the ordinary course of law enforcement" unless there is express notice to the people whose conversations are being listened to. The statute does not say this, and it cannot be right. If there is actual notice, as in *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989), there will normally be implied consent. *United States v. Workman*, 80 F.3d 688, 692–94 (2d Cir.1996); *United States v. Van Poyck*, 77 F.3d 285, 292 (9th Cir. 1996); *United States v. Horr*, 963 F.2d 1124 (8th Cir.1992); *Griggs–Ryan v.*

*Smith*, 904 F.2d 112, 116 (1st Cir.1990); *United States v. Amen*, 831 F.2d 373, 379 (2d Cir.1987). So if the "ordinary course" exclusion required proof of notice, it would have no function in the statute because there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception. 18 U.S.C. § 2511(2)(c). In *United States v. Daniels*, 902 F.2d 1238, 1245 (7th Cir. 1990), which dealt with the recording of prisoners' calls—and incidentally questioned whether assuming a risk of being overheard is the same as consenting to being overheard—we made clear that the ordinary-course exclusion has its own domain. What that domain is, however, is a bit obscure.

■ Investigation is within the ordinary course of law enforcement, so if "ordinary" were read literally warrants would rarely if ever be required for electronic eavesdropping, which was surely not Congress's intent. Since the purpose of the statute was primarily to regulate the use of wiretapping and other electronic surveillance for investigatory purposes, "ordinary" should not be read so broadly; it is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations. (This interpretation may have much the same practical effect as the interpretation mentioned earlier in which "ordinary course" refers to recording calls on one's own line; for ordinarily when police record calls as part of an investigation they are recording calls on someone else's line.) Such recording will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion: what is ordinary is apt to be known; it imports implicit notice. To record all calls to and from a police department is, for the reasons explained earlier, a routine police practice. If "ordinary course" of law enforcement includes anything, it includes that. *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 821–25 (N.D.Ill.1981); cf. *United States v. Dan-*

*iels, supra,* 902 F.2d at 1245. The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges.

■ What would not be routine would be if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were *not* being recorded, and then recorded them anyway. Such a scheme would not be in the "ordinary" course of law enforcement; it would be extraordinary. Title III does not forbid all nonconsensual electronic eavesdropping, of course, but it does require a warrant for electronic eavesdropping that is not within one of the exclusions. 18 U.S.C. § 2516; *United States v. Cunningham,* 113 F.3d 289, 293–95 (1st Cir.1997). In the absence of a warrant, the practice that we have just described would not (if we set to one side the possibility that anything a subscriber does on his own line is "ordinary") be protected by the law-enforcement exemption. See *In re State Police Litigation,* 88 F.3d 111, 121, 126 (2d Cir.1996). The boundary is between routine noninvestigative uses of electronic eavesdropping and its use either as a tool of investigation (which requires a warrant) or as a device for intimidation, suppression of criticism, blackmail, embarrassment, or other improper purposes. See *United States v. Harpel,* 493 F.2d 346, 351–52 (10th Cir.1974).

The plaintiffs charged, but the evidence did not compel the jury to find, that the defendants crossed this boundary. Remember that the decision to tap 338–7799 was precipitated by an official use of the line which showed that it had been a mistake to leave it untapped. Rather than being outside the ordinary course of law enforcement, the decision brought the line within that course. That personal as well as official calls were made on the line is irrelevant; *all* employees make personal calls on company phones; if all the lines are taped, as is the ordinary practice of police departments, then the recording of

personal as well as of official calls is within the ordinary course. Although eventually the recording of calls on 338–7799 "caught" a plaintiff criticizing another member of the force, the purpose of recording calls on the line was not (or so at least a reasonable jury could find) to intimidate the people using the line. The invasion of privacy was regrettable, but if all Congress had cared about was the protection of privacy it would not have written an exception for electronic eavesdropping in the ordinary course of law enforcement into the statute; it would in every case have required consent—and of both parties to the conversation, as in some state statutes, rather than just of one party.

■ The plaintiffs also complain about the dismissal of the City of Woodstock as a defendant, which was, however, proper, because Title III does not allow for suits against municipalities. 18 U.S.C. § 2510(6). They also challenge the instructions. Rather than instructing the jury that it must decide whether the recording of calls on 388–7799 was within the ordinary course of law enforcement, the judge instructed it to decide whether the taping had been done "secretly." The plaintiffs did not object to the instruction when given, and so will not be heard to complain about it now, Fed.R.Civ.P. 51; *Vaughn v. King,* 167 F.3d 347, 353 (7th Cir.1999); *Knox v. Indiana,* 93 F.3d 1327, 1333 (7th Cir.1996); *Samara Bros., Inc. v. Wal–Mart Stores, Inc.,* 165 F.3d 120, 130 (2d Cir.1998)—especially since the instruction was more favorable to them than the law. Taping could be said to be done "secretly" if the persons whose conversations are taped are not told about it, and so understood the instruction collapsed the ordinary course of law enforcement exclusion into the consent exclusion. "Secretly" also connotes, however, like "surreptitiously," which the judge replaced in the instructions with "secretly" lest some jurors not know what "surreptitiously" means, doing something sneakily, implying a purpose to trap. Some district court cases

say that the ordinary-course defense does not extend to "surreptitious" taping, e.g., *Abbott v. Village of Winthrop Harbor*, 1998 WL 433772, at *11 (N.D.Ill.1998); *George v. Carusone*, 849 F.Supp. 159, 164–65 (D.Conn.1994), but this is a potentially misleading usage and should be avoided.

■ The plaintiffs challenge the district court's refusal to certify the suit as a class action. The challenge is mysterious on two grounds. First, it is impossible to see how the plaintiffs would have been better off at trial had the case been litigated as a class action. Class actions are rarely tried, but when they are the trial proceeds the same way it does in an ordinary case— there are no special *trial* procedures for class actions as such, though if the suit is particularly complex, as some nonclass actions are and some class actions, including this one, are not, the ordinary trial procedures may have to be modified. Fed. R.Civ.P. 23(d)(1); *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir.1992). We have never before heard it argued by a plaintiff who lost at trial that he would have won had his suit been certified as a class action.

■ Second, it makes no sense for a losing party to take an *unconditional* appeal from a refusal to certify his case as a class action. For if the court of appeals affirms the merits judgment and reverses the denial of class certification, the effect will be to extinguish the rights of all the class members who had not opted out of the litigation. *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157–58 (7th Cir. 1999), and cases cited there. The wise plaintiff will either let sleeping dogs lie, or make his appeal from the denial of class certification conditional on the court of appeals' reversing the merits judgment. Cf. *Council 31 v. Ward*, 978 F.2d 373, 380–81 (7th Cir.1992). It is true that if he tries the latter tack, he may be met by the rule against one-way intervention in class actions, on which see Fed.R.Civ.P. 23(c); Advisory Committee Notes to 1966 Amendment, Subdivision (c)(3); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 362–67 (7th Cir.1987). The rule bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment. But the way Rule 23(c) prohibits this practice is by requiring the district judge to make an early determination whether the suit is to proceed as a class action and who shall be bound by the judgment as members of the class. The rule does not appear to be addressed to the case in which class certification is denied; and anyway that is a case in which the defendants can protect themselves against "one-wayness" by filing a cross-appeal challenging the denial of class certification in order to bind unnamed class members to the judgment should it be affirmed. The defendants did not do this here. Since the plaintiffs, having lost on the merits in this court, cannot possibly benefit from class certification, and the defendants are not seeking it, we shall treat the issue as moot, and so not pursue further the question whether a conditional appeal from the denial of class certification violates the rule against one-way intervention in class actions.

■ Rule 68 of the Federal Rules of Civil Procedure authorizes a defendant to make an offer of judgment before trial. A plaintiff who turns down the offer and then does worse at trial has to pay the defendant's costs (and his own). Does worse, but still wins; for if he loses, he would have to pay the defendant's and his own costs anyway. Rule 68 bites only when the plaintiff wins but wins less than the defendant's offer of judgment. The defendants here offered each of the plaintiffs $2,000 under Rule 68 but made the offer conditional on all the plaintiffs' accepting it. Some did accept the offer but not all and so the offer lapsed. The plaintiffs argued that conditioning the offer on acceptance by all of them was invalid and that the proper remedy was to make the defendants pay each of the plaintiffs who tried to accept the offer the $2,000. The

district judge agreed that the condition was invalid but he thought this made the offer inoperative, and so he refused to enforce it. The defendants argue that the condition was valid and therefore the offer was not validly accepted by the plaintiffs who tried to do so. Thus both sides disagree with the judge's invalidating the offer, though the defendants support his bottom line, since even if their offer was invalid, as the judge thought, and so ineffective to shift costs if the plaintiffs won (but won less than the offer), the plaintiffs lost and so there was no cost shifting.

We cannot find anything in the rule, or the case law, to support the view that the condition which the defendants imposed—all the plaintiffs must accept the offer of judgment for it to be effective—is invalid, or if it is that the offer is therefore enforceable. The only appellate case we have found upheld such a condition, *Lang v. Gates*, 36 F.3d 73, 75 (9th Cir.1994), and in support of it we note that since the purpose of an offer of judgment is to settle the case in advance of trial, conditioning it on acceptance by all plaintiffs may be necessary to head off the trial. Especially where there are many plaintiffs, which can create a serious holdout problem. Suppose the offer of judgment had been unconditional and 62 of the 63 plaintiffs had accepted it. The sixty-third would be in a position to extract a handsome settlement offer from the defendants, who otherwise would have to incur the expense of a trial. The defendants would have spent $124,000 (62 × $2,000) to avert a trial, and surely would be willing to spend another $10,000, say, to achieve that objective. Knowing from this example that the best position to be in is that of the holdout, the other plaintiffs—those who we assumed would have accepted the defendants' offer—would in fact have been reluctant to accept it. Each would have had an incentive to hang back in the hope that the others would accept it. This is why the defendants' form of offer in this case promoted rather than retarded the objectives of Rule 68; it made it less likely that the case would go to trial.

Against this it has been argued that if different plaintiffs value the case differently the defendant can be sure that his offer will be turned down and he will avoid having to pay the costs of at least some of the plaintiffs, and that this is unfair. See *Tocwish v. Jablon*, 183 F.R.D. 239 (N.D.Ill. 1998), and cases cited there discussing state-law counterparts to Rule 68. Suppose plaintiffs A and B value their claim at $1,500, and plaintiff C values his claim at $2,500. Then the defendant's $2,000 offer will be sure to be rejected if conditioned on unanimous consent, and assuming the defendant guessed right and the plaintiffs win $2,000 apiece at trial, he will avoid paying A's and B's costs, even though they would have accepted his offer had he not imposed the unanimity condition.

But A's and B's real quarrel in such a case, it seems to us, would be with the asymmetry built into Rule 68: only a defendant can make a settlement offer that (if not accepted and the other party does worse than the offer) will let a losing party out of having to pay costs. A plaintiff has no right to demand a Rule 68 offer and therefore no right to demand that the defendant configure the offer in a way that will assure its acceptance. Proposals to "symmetrize" Rule 68 have been made, see, e.g., Committee on Rules of Practice and Procedure, "Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure," 102 F.R.D. 407, 432–37 (1984); Geoffrey P. Miller, "An Economic Analysis of Rule 68," 15 *J. Legal Stud.* 93, 123–25 (1986), but not adopted.

A better point for the plaintiffs than the possibility of their having varying estimates of the value of the suit is the possibility already discussed of holdout behavior by one of the plaintiffs, but now directed at extracting concessions from the other plaintiffs rather than from the defendants. Suppose that 62 of the 63 plaintiffs are eager to accept the defendant's rule 68 offer, but the sixty-third balks unless the other plaintiffs will agree to give him 10 percent of their share of

the settlement. It would be odd if, negotiations breaking down, the plaintiffs who wanted to accept the defendant's offer would be barred from obtaining costs should they prevail at trial. They could not enforce the offer, because they could not accept it in accordance with its condition of unanimity; but it can be argued that the conditional offer, though valid, should be ineffectual to block the plaintiffs who had signified their desire to accept it from obtaining costs. That is not argued here (costs are not in issue, as we saw), and so we need not attempt to resolve the issue. The plaintiffs are seeking to enforce an offer that they were precluded from accepting by the nonfulfillment of the unanimity condition, and this they cannot do.

So we find no basis for disturbing the judgment. But we point out that the plaintiffs' side of the case has not lost utterly. (815) 338–7799 is no longer a recorded police line; it is now the phone number of the plaintiffs' lawyer.

AFFIRMED.