776 A.2d 80

Jack J. SCHMERLING et al.

v.

INJURED WORKERS' INSURANCE FUND.

No. 1697, Sept. Term, 2000.

Court of Special Appeals of Maryland.

July 6, 2001.

472

**474**

Charles J. Piven (Marshall N. Perkins and Jeff E. Messing, on the brief), Baltimore, for appellants.

Anthony. J. Zaccagnini (Semmes, Bowen & Semmes, P.C., on the brief), Baltimore; Alan I. Baron (Dorsey & Whitney, L.L.P., on the brief), Washington, DC, for appellee.

Argued before KENNEY, KRAUSER, and RAYMOND G. THIEME, Jr. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Retired, Specially Assigned.

This is an appeal from summary judgment granted in the Circuit Court for Baltimore County in favor of appellee, the Injured Workers' Insurance Fund ("IWIF").[1] Appellants Jack J. Schmerling and others alleged that appellee violated the Maryland Wiretapping and Electronic Surveillance Act (the "Maryland Wiretap Act" or the "Act"), Md.Code (1973, 1998 Repl.Vol., 2000 Cum.Supp.), § 10–401 *et seq.* of the Courts & Judicial Proceedings Article. They allege that IWIF, which records calls for the purposes of quality assurance, did so by using parts of its telecommunications system in the ordinary course of business to monitor and record business calls, allegedly without the prior consent of other parties.

---

1. IWIF was created by statute, *see* Md.Code (1991, 1999 Repl.Vol.), § 10–104 of the Labor & Employment Article, but is independent of any governmental unit. Md.Code (1991, 1999 Repl.Vol., 2000 Cum.Supp.), § 10–105(a) of the Labor & Employment Article. It is a component of the Property Casualty Insurance Guaranty Corporation. § 10–105(c).

The court below found that, based upon the undisputed facts, IWIF had used its equipment in the ordinary course of its business and within the telephone equipment exception contained in section 10–401(4).[2] Appellants filed timely notice of appeal and ask:

1. Did the court below err when it found that IWIF''s use of certain add-on recording equipment was within the telephone equipment exception of the Maryland Wiretap Act, when that recording equipment had been integrated into IWIF''s telephone system for the undisputed purpose of improving its communications with customers, claimants and others in the ordinary course of business?

2. Did the court below err by accepting IWIF''s Answer to appellants' Second Amended Complaint, when IWIF had previously denied the substance of appellants' allegations and appellants suffered no prejudice?

3. Did the court below err when it allowed IWIF to amend several affidavits to cure alleged format deficiencies that did not change the substance of the affidavits?

To these questions, we answer "no" and explain.

## Facts

IWIF is the legislatively established successor to the Maryland State Accident Fund. *See supra* note 1. It provides

---

**2.** The Maryland Wiretap Act restricts use of "electronic, mechanical or other device(s)" other than the following:

> (i) Any telephone or telegraph instrument, equipment or other facility for the transmission of electronic communications, or any component thereof, (a) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by the subscriber or user for connection to the facilities of the service and used in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; or
>
> (ii) A hearing aid or similar device being used to correct subnormal hearing to not better than normal.
>
> § 10–401(4).

workers' compensation insurance and associated services to Maryland businesses. IWIF does not produce tangible products like motor vehicles or cans of soup. Instead, a service relationship—with its customers, claimants and the public at large—is IWIF"s only product, and that tenuous relationship can be destroyed though poor communications and customer service.

Like any other business, IWIF must control the quality of its product offering. Unlike other businesses, however, IWIF"s products may not be readily observed by persons other than the parties to the oral communications its representatives conduct—its customers, claimants, and members of the general public. Recording these communications allows IWIF managers to take quality control measures and so determine whether representatives are handling inquiries and requests with courtesy and dispatch.

During 1995 and 1996, IWIF upgraded its telecommunications system as part of a company-wide effort to improve operations. New hardware and software added to the system included voice mail, automatic call distribution, and monitoring capabilities.

A modern business telecommunications system may be assembled from various components, each of which is designed to perform certain functions and to provide specific features. Experts might liken such a process of systems integration to designing a sophisticated multi-component stereo system or building a home computer. Some music lovers or home "hackers" might prefer to visit a single vendor, plan the ideal system, purchase all the component parts during one shopping trip—perhaps even components made by a single manufacturer—and allow the manufacturer or vendor to handle assembly and set-up. Others, whether staying within a budget or seeking out the best new technology, buy a new .ZIP drive here or new DVD player there and build an ideal system over time. For businesses to self-design and assemble telecommunications systems is a relatively new trend. Forty years ago, Ma Bell held both service and the supply of equipment in her

ironclad grip, and the choices available to businesses were limited indeed. Between deregulation and advancing technology, the market is now wide open, and business owners can contract for or even self-assemble any combination of equipment and services from multiple vendors.[3]

Thus, like a music lover wiring Bose speakers to a Sony tuner and a Bang and Olufson CD player, IWIF set about in the late 1980's to assemble a telecommunications system. It started with the purchase of a Meridian Private Branch Exchange ("PBX") in 1987.[4] A PBX is a modern private switching system that directs telephone calls received through Verizon's "trunk line" into the facility to specific individual extensions. It replaces the operator-run switchboards of old and forms the backbone of a modern business telecommunications system. It is *not*, however, the sum and substance of that system, any more than a "motherboard" comprises an entire personal computer.

Over time, IWIF added many capabilities to its basic telecommunications system, consisting in part of the PBX, handsets, and wiring. Specifically, IWIF added:

 i. a voice mail system to provide common voice messaging capabilities;

 ii. an Automatic Call Distributor ("ACD") to enable the even distribution of incoming calls to representatives at IWIF's customer service center;

---

**3.** Indeed, Congress recognized the effects of industry deregulation on procurement when it amended the federal counterpart to the Maryland Wiretap Act, 18 U.S.C. § 2510 *et seq.* (2000), to allow the telephone equipment exception for business users to encompass equipment "furnished by the subscriber" or any "provider of wire or electronic communication," rather than limit such equipment to that which a communications common carrier provides. *See* S.Rep. No. 99–541, at 3 (1986), U.S.Code Cong. & Admin.News 1986 at pp. 3555, 3556–57.

**4.** At the time, Meridian equipment was manufactured by Northern Telecom, Inc., now known as Nortel Networks, Inc. The Meridian brand is now manufactured by Williams Communications Solutions. Bell Atlantic, now doing business as Verizon, distributed Meridian systems in the late 1980's.

iii. two multichannel digital announcers, which automatical-ly give certain announcements to callers, *e.g.,* when the office is closed or when all representatives are assisting other callers;

iv. a battery back-up power supply to protect the PBX from electrical problems; and

v. the monitoring system in question, which allows IWIF supervisors to monitor telephone calls between its representative and the public.

Northern Telecom and its successors did not make or sell much of the foregoing equipment; in fact, Racal manufactured the monitoring system, which IWIF procured in 1996.

Various components of IWIF"s telecommunications system are located throughout its building. The location of specific equipment is determined by many factors, including the degree of regular physical access required for IWIF employees and others. Those components of the system connecting to Verizon's incoming lines are located in the garage. The PBX and other equipment requiring only occasional maintenance by a few persons is located in a switching room on the second floor of the building. Some 600 telephone handsets are located throughout the building for the convenience of users. All the telecommunications devices at IWIF are linked by literally miles of wiring. Some pieces of equipment, *e.g.,* handsets for individual extensions, plug into wall ports, which in turn connect to the wiring. Other equipment connects to the system via "punch blocks," which are the multi-circuit connectors commonly used in the switching rooms of commercial telecommunications systems.[5]

IWIF bought the Racal equipment in question in 1996 from Simko Office Systems, a distributor of such hardware. Representatives from Simko worked with IWIF employees to install the equipment and integrate it into the larger on-site telecom-

---

5. A punch block is a plastic frame with a number of slots on either side. Telephone wires are "punched down" in the slots on one side to secure connections with wires punched into the corresponding slots on the other side.

munications system. The Racal hardware is physically separate from the PBX, just as, we note, the voice mail and ACD modules are separate. For the convenience of those IWIF employees who must service the equipment and retrieve recordings, to ensure physical security, and to preserve the limited space in the switching room, the Racal recording equipment is located in a locked area on the first floor of IWIF's facility. The equipment for reproduction of stored calls is located on the third floor. All Racal recording equipment is integrated with the rest of the telecommunications system via punch block connections. To enable the recording of calls made to and from digital handsets, the signal is converted to analog in the handset and routed through the Racal system via a second analog line.

Each Racal recording unit can monitor sixty-four separate telephone lines at one time and store the conversations digitally. IWIF collects input from all parties participating in each telephone call made to and from the monitored extensions; without hearing all sides of each conversation, it would be impossible for management to determine the quality of service rendered. To function properly, the Racal units must be integrated into a larger telecommunications system, as they are at IWIF's facility. Unlike, *e.g.*, a cassette tape recorder, the Racal hardware has *no* stand-alone functionality. Its sole purpose is to monitor telephone calls as part of an integrated telecommunications system.

Without dispute, IWIF's entire purpose in installing the Racal hardware has been to improve its customer service. Monitoring calls allows IWIF management to evaluate its level of service, identify instructional needs on an individual and a group basis, and gauge the effectiveness of its training measures. This practice also allows IWIF to review calls when disputes later arose and enabled claims representatives to take recorded statements more efficiently.[6] These are the only uses of the system to surface in testimony.

---

6. We note that IWIF's practice of recording statements related to the filing of claims long pre-dated acquisition of the Racal hardware.

Prior to installing the system, IWIF trained all of its employees slated to use monitored lines and their supervisors as well. The training informed employees about the general characteristics of the system and the goals and procedures for the monitoring program. Among other things, employees learned that unmonitored lines were available for personal calls. To ensure that the system would not be misused, IWIF limited physical access to a small group of employees, including supervisors and those responsible for retrieving the messages and maintaining the system. No non-business uses of the system surfaced in depositions; and, indeed, appellants claim none, as their calls to the fund related entirely to business transactions.

IWIF produced testimony showing that the system has helped the organization accomplish the purposes for which it was obtained. Supervisors have been able to select for review, at their convenience, calls from different dates and times, and thus no longer have to monitor "live" calls. The system allows them to ascertain quickly any quality concerns about specific employees and to avoid listening to calls that are irrelevant for the purpose of quality control. Conversely, supervisors can also retrieve the specific calls about which they have received complaints or problem reports, and this practice has helped reduce the overall number of complaints.

Appellants commenced the action *sub judice* on February 23, 1999, by filing a Complaint putatively, as a class action, with the court below. That pleading was never served. Appellants amended their complaint on April 12, and it was served.

The parties identified the issue of the applicability "of the telephone exemption provided in the Definitions Section 10–401 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland" as potentially dispositive. That exemption excludes from the definition of wiretapping the use of telephone equipment to monitor or record calls in the ordinary course of business. *See supra* note 2. The parties agreed to a scheduling order. On February 4, 2000, both

parties moved for summary judgment—appellants for judgment that the exception did not apply; IWIF for a judgment that it did. The court heard oral arguments on March 9, and there decided some collateral issues without resolving the dispositive issue.

Two weeks and three days before summary judgment briefs were due, however, appellants amended their complaint again to restore their prayer for statutory liquidated damages that had been omitted in the First Amended Complaint. IWIF answered on February 17, as it had for previous complaints, denying any violation of the Act. The next day, appellants moved to strike the Answer as untimely under Maryland Rule 2–341(a).[7] The court denied that motion at the March 9 hearing, finding that IWIF had generally denied any allegations that it had violated the Act, and appellants had not been prejudiced by the delay.

Additionally, within a few days of the March 9 hearing, appellants moved to strike four affidavits submitted by IWIF with its summary judgment motions, asserting that those affidavits failed to comply with Maryland Rule 2–501(c).[8] At the hearing, the court granted appellants' motion to strike, but allowed IWIF the opportunity to add language curing the

---

**7.** Rule 2–341(a) states in relevant part that if one party amends its pleading more than 15 days before trial, the other party may move to strike, or

[i]f an amendment introduces new facts or varies the case in a material respect, an adverse party who wishes to contest new facts or allegations shall file a new or additional answer to the amendment within the time remaining to answer the original pleading or within 15 days after service of the amendment, whichever is later. If no new or additional answer is filed within the time allowed, the answer previously filed shall be treated as the answer to the amendment.

Amendments introducing new facts or allegations filed within 15 days of trial are assumed denied, unless it would be unjust to do so. *See* Rule 2–341(b).

**8.** Rule 2–501(c) states:

An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.

defects without changing the substance of the statements. It did so successfully.

After the March 9 hearing, both parties filed supplemental briefs to address questions raised at the hearing. The court held a second hearing on the summary judgment motions on August 24, at which it ruled that the undisputed facts showed that IWIF used its telecommunications system, including the Racal components, within the exception of section 10–401(4). Appellants timely appealed.

## Discussion

This court reviews grants of summary judgment *"de novo* under a simple standard: whether the trial court's legal conclusions were correct." *McCoy v. Hatmaker,* 135 Md.App. 693, 704, 763 A.2d 1233 (2000); *see also Goodwich v. Sinai Hosp.,* 343 Md. 185, 204, 680 A.2d 1067 (1996); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *Barnett v. Sara Lee Corp.,* 97 Md.App. 140, 146, 627 A.2d 86 (1993). Our analysis of whether the circuit court was correct invokes the well-established standard for summary judgment, whether "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e); *see also Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993). The court's review also considers whether a dispute of material fact calling for trial actually exists, *Lombardi v. Montgomery County,* 108 Md.App. 695, 709–10, 673 A.2d 762 (1996), or whether that so-called dispute is mere wishful thinking on the part of the party seeking to block summary judgment. Once the moving party has provided the court with sufficient grounds to sustain summary judgment, the non-movant must have demonstrated that there exists no genuine dispute of material fact in order for the court below to have blocked summary judgment. Here, the non-movants would have done so by presenting facts that would be admissible in evidence. *Id.* at 710, 673 A.2d 762; *see also Goodwich,* 343 Md. at 206, 680 A.2d 1067.

 A genuine issue of material fact is a factual dispute that is real and not imagined. "Neither general allegations of facts in dispute nor a mere scintilla of evidence will suffice to support the non-movant's position; there must be evidence upon which the jury could reasonably find for the moving party." *Fearnow v. Chesapeake & Potomac Tel. Co.*, 104 Md.App. 1, 48, 655 A.2d 1 (1995), *aff'd in part, rev'd in part*, 342 Md. 363, 676 A.2d 65 (1996). A material fact is one that would "affect the outcome of the case." *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). Summary judgment may not be defeated by a dispute as to a fact that is immaterial. *Scroggins v. Dahne*, 335 Md. 688, 690–91, 645 A.2d 1160 (1994).

 As for the procedural issues, the court's decisions to accept an untimely Answer and to permit IWIF to amend its affidavits are matters within its sound discretion. *Mattvidi Associates Ltd. Pshp. v. NationsBank of Virginia, N.A.*, 100 Md.App. 71, 83, 639 A.2d 228 (1994) (quoting *Robertson v. Davis*, 271 Md. 708, 710, 319 A.2d 816 (1974)); *see also Ski Roundtop, Inc. v. Wagerman*, 79 Md.App. 357, 371, 556 A.2d 1144 (1989). We review decisions such as these for abuse of discretion.

Appellants' arguments related to the dispositive issue fail because they are based upon a faulty notion of how a modern business telecommunications system is assembled. Appellants seek to prove that IWIF's recording equipment was not integral to its telecommunications system, because that equipment was purchased later than the main system and from a different vendor. Appellants assume, however, an outdated paradigm of business telephony dating from the time that a single monopoly telephone company controlled the market and, thus, dictated the choices available to consumers. More modern mainstays of commercial telephony, consumer choice, and competition are beyond appellants' field of vision.[9] If the

---

9. Interestingly, appellants presented *no* expert testimony regarding which components *should* comprise a business telecommunications

Act were to require that all components had been purchased at one time from one vendor, few companies would meet the exception set forth in section 10–401(4). Moreover, appellants provide *no* rationale as to why we should treat the Racal recording and reproduction equipment any differently from similar equipment found by other courts to be within the exemption. Neither do they adduce *any* facts that would show that IWIF was not acting in the ordinary course of business, and, in fact, they plead otherwise. The judgment of the trial court thus stands on its merits. As for the procedural issues, we hold that appellants failed to establish any abuse of discretion and we affirm.

I

Subject to certain exceptions, the Maryland Wiretap Act makes it unlawful to "[w]ilfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." Md. Code (1973, 1998 Repl.Vol., 2000 Cum.Supp.), § 10–402(a)(1) of the Courts & Judicial Proceedings Article. To intercept such communication, one must acquire aurally or otherwise "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." § 10–401(3). Certain interceptions, however, are legal and covered under the Act's exceptions. For example, interceptions captured using

> [a]ny telephone or telegraph instrument, equipment or other facility for the transmission of electronic communications, or any component thereof, ... furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by the subscriber or user for connection to the facilities of the service and used in the ordinary course of its business,

system. They relied instead upon the analysis of those business telephony authorities, their attorneys.

do not violate the Act. § 10–401(4)(a). Instead, they fall under what is commonly called the "telephone equipment exception," "telephone extension exception," or "business extension exception."

The telephone equipment exception has two prongs. *T.B. Proprietary Corp. v. Sposato Builders Inc.*, No. 94–6745, 1996 WL 290036 at *3, 1996 U.S. Dist. Lexis 7464, at *9–10 (E.D.Pa. May 31, 1996). To be within the exception, the equipment must be a "telephone ... [i]nstrument, equipment or other facility for the transmission of electronic communications, or any component thereof ... furnished by the subscriber or user for connection to the facilities of the service." § 10–401(4)(i)(a). Second, the equipment must be "used in the ordinary course of [the user's] business." *Id.*

We note that the case *sub judice* is one of first impression for Maryland courts. The only reported case dealing with the telephone equipment exception examined whether police officers could allow a crime victim to listen in on an extension telephone in order to identify a suspect by voice. *See Adams v. State*, 43 Md.App. 528, 406 A.2d 637 (1979), *aff'd* 289 Md. 221, 424 A.2d 344 (1981). The instant case is the first time an appellate court in this State has examined the use of add-on recording equipment in the workplace to monitor service personnel who interact with customers by telephone.

Because scant Maryland authority on this issue exists, we must turn to federal cases and those from other state courts. The Maryland Wiretap Act is substantially identical to the federal statute and the statutes of many other states. *Compare, e.g.*, § 10–401(4) (defining "electronic, mechanical, or other device"), *with* 18 U.S.C. § 2510(5) (same). In fact, the only significant difference between the Maryland Act and the federal statute is the number of parties that must consent to an otherwise prohibited interception. *Compare* § 10–402(c)(3) ("It is lawful under this subtitle for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication and where *all* of the parties to the communication have given prior consent to the intercep-

tion....."), *with* 18 U.S.C. § 2511(2)(d) (2000) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where *one* of the parties to the communication has given prior consent to such interception....") (emphasis added).

The issue *sub judice* relates not to the number of consenting parties involved, but instead to whether IWIF's use of aftermarket add-on recording equipment for quality control falls within the exception. Thus, any differences between the Maryland Act and its counterparts do not come into play. Accordingly, we may look to other courts' interpretations of those other acts. *See State v. Bailey,* 289 Md. 143, 151–52, 422 A.2d 1021 (1980) ("The Maryland 'Wiretapping and Electronic Surveillance' law is an offspring of the Omnibus Crime Control and Safe Streets Act of 1968, ... commonly called Title III. Title III provides federally mandated minimum guidelines for the use of wiretaps. The states are required to apply a standard no more lenient than the federal law, and may opt for a more restrictive policy if they so choose.... In construing the Maryland statute, therefore, we must ensure that our interpretation does not fall below federal guidelines."); *Adams,* 43 Md.App. at 536, 406 A.2d 637 (relying on federal cases, explaining, "[a]lthough the federal and Maryland acts differ in ... two respects, in the section which is dispositive of the issue before us, the federal and the Maryland acts are identical").

We also note that, as part of the definition of "[e]lectronic, mechanical, or other device," the telephone equipment exception is not an affirmative defense, *see* Md. Code (1973, 1998 Repl.Vol., 2000 Cum.Supp.), § 10 410(b) of the Courts & Judicial Proceedings Article (setting forth affirmative defenses), but instead must be an element of any claim that the Act has been violated. *See, e.g., Arias v. Mutual Cent. Alarm Serv.,* 182 F.R.D. 407, 413 n. 42 (S.D.N.Y.1998) ("The relevant portion of 18 U.S.C. § 2510(5) often has been referred to as the telephone extension/business use defense.

That, however, is a misnomer. It is plaintiffs' burden to make out the elements on their claim ...."), *aff'd*, 202 F.3d 553 (2d Cir.2000). Appellants thus bore the burden of proving that the recording equipment in question met the statutory definition of an "electronic, mechanical, or other device." *Id.* at 414. The court below could have reached that conclusion, and denied summary judgment, only if appellants had presented any evidence at all tending to show that the Racal recording equipment would not fall under the exception. *See T.B. Proprietary Corp.*, 1996 WL 290036 at *3–4, 1996 U.S. Dist. Lexis 7464, at *9–10 (applying the federal telephone equipment exception at summary judgment); *see also United States v. Christman*, 375 F.Supp. 1354, 1356 (N.D.Cal.1974). They failed to do so.

In seeking to establish that the recording equipment falls outside of the statutory definition, and thus the exemption, appellants try to show that the recorders were not telephone equipment and were not used in the ordinary course of business. They point out that the recorders were attached as an afterthought long after the original telecommunications system was in place and bear a different brand label from the original system. They also note that the recorders cannot stand alone *as telephones, i.e.,* it would be impossible to place a call using this equipment. Appellants grasp at straws, however, in terms of both the realities of modern telecommunications equipment and the statutory interpretation they espouse.

A

At the outset, we note that other courts routinely find that equipment similar to the Racal recorders, integrated and used in similar fashion, falls within the statutory exceptions for telephone equipment. *See, e.g., Arias*, 182 F.R.D. at 407 (routine recording of all calls at alarm monitoring company using attached Dictaphone equipment within telephone equipment exception); *Jandak v. Brookfield*, 520 F.Supp. 815 (N.D.Ill.1981) (recording of personal call made at police station on line intended for use in investigations within telephone

equipment exception); *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 687 N.E.2d 1241 (1997) (telemarketing calls made by common carrier to customers within telephone equipment exception); *Dillon v. Massachusetts Bay Transp. Auth.*, 49 Mass.App.Ct. 309, 729 N.E.2d 329 (2000) (routine recording of calls made at public transit authority operations center within telephone equipment exception). Appellants simply ignored these well-known cases in their opening brief, then failed to distinguish them meaningfully in their reply brief.

 These cases, however, are thoroughly on-point. The characteristics of the Racal recorders used here and their function within IWIF's telecommunications system establish that they fall within the telephone equipment exception, as it was intended by the legislature. The recorders were designed and manufactured to be used in the way that IWIF uses them—as integrated components of a larger system, providing call monitoring capabilities for that system. *See O'Sullivan*, 687 N.E.2d at 1245 ("The 'AutoQuality!' system utilized by NYNEX is 'telephone equipment' within the meaning of the Massachusetts wiretap statute, because ... the system was designed for and used by the telephone company randomly to monitor and record telephone conversations in the ordinary course of business to manage the quality of services it provided to its customers."); *Dillon*, 729 N.E.2d at 335 ("Similarly [to the 'AutoQuality' system in *NYNEX*], the MBTA devices, commercially designed, were purchased by the defendant for routine business, were directly integrated into phone lines on which they depended in order to function, and recorded conversations for possible future listening."). IWIF purchased the equipment for integration with its telecommunications system. *Cf. Williams v. Poulos*, 11 F.3d 271, 280 (1st Cir. 1993) ("we are at a loss to see how the monitoring system used here, consisting as it did of 'alligator clips attached to a microphone cable at one end' and an 'interface connecting [a] microphone cable to a VCR and a video camera' on the other, can be considered to be a 'telephone or telegraph instrument, equipment or facility, or a[ ] component thereof ' "); *Pascale v. Carolina Freight Carriers Corp.*, 898 F.Supp. 276, 279 (D.N.J.

1995) (three Radio Shack voice-activated tape recorders "placed next to, or connected with, a telephone receiver cannot itself be the 'acquiring' mechanism. It is the receiver which serves this function—the recorder is a mere accessory...."). Unlike off-the-shelf recording devices available at retail outlets and useful for other stand-alone recording applications, the Racal recorders are highly specialized, expensive hardware designed to add monitoring functions to a commercial telephone system, much like a turntable component is designed to be integrated into a stereo system or a hard drive is designed to be installed in a personal computer.

The recorders, moreover, were designed to support a function related to the effectiveness of the telecommunications system, namely, monitoring of the use of that system to interact with customers and the public, and they were actually used for that purpose. Whether courts consider add-on equipment part of a telecommunications system and thus apply the telephone equipment exception often, in fact, turns upon "whether the equipment 'had a positive impact on efficiency, clarity, cost, or any other factor by which one would measure the effects on a communication system.'" *See T.B. Proprietary Corp.,* 1996 WL 290036, at *4, 1996 U.S. Dist. Lexis 7464, at *11 (quoting *Pascale,* 898 F.Supp. at 281). The Racal recorders, moreover, have no use outside of their integrated functioning in IWIF's system, nor can they be accurately described as stand-alone recording equipment—to wit, one cannot dictate letters using the recorders or bring a recorder into a meeting to capture what transpires. Appellants here make no claim that the Racal equipment can function in stand-alone capacity, as likely could the standard videocassette recorder and video camera in *Williams. See* 11 F.3d at 280.

Instead, they make weak arguments regarding the timing of the installation of the recorders—years after the initial system was installed—and the fact that the recorders came from a different manufacturer than the original system.[10] They also

---

**10.** To make their argument, appellants cite, with little regard for accuracy, testimony that would be inadmissible at trial. For example,

contend that because the recorders cannot be used to place a
call, they cannot be considered telephone equipment. The
same can be said, however, about much of the other hardware
comprising the overall system, and one need not be able to
place a call using a piece of hardware for that device to be
considered part of the telephone system. *See Jandak*, 520
F.Supp. at 822 (explaining that the telephone equipment ex-
ception extends beyond those basic instruments necessary to
complete a telephone call) ("it is clear from the language of
the exception that it exempts more than just extension tele-
phones"). The Racal recorders, like all other such hardware,
are integrated into IWIF's telecommunications system using
wiring practices standard in business telephony, and their
connections are indistinguishable from those for the other
hardware, including those components that could be used
alone to place calls. Finally, the fact that the Racal equip-
ment is located separate from the switching equipment for the

---

appellants cite the deposition testimony of Nortel's representative to
contend that the Racal recorders, and other after-market equipment
like them, were not part of IWIF's telephone system. The Nortel
representative, however, did not assert such views, but instead stated
that he had "no idea" as to the specific equipment IWIF had and that
he lacked familiarity with Racal recording equipment. His testimony
cannot be used to infer that the Racal equipment had not been integrat-
ed into IWIF's telecommunications system.

Likewise, appellants seek to construe deposition testimony by repre-
sentatives of Racal and Williams Communications to show that the
recording devices were peripheral to the telecommunications system.
Aside from removing their testimony from its proper context, appellants
conveniently omit the fact that such testimony was taken under IWIF's
ongoing objection that these deposition witnesses were being asked to
draw ultimate legal conclusions rather than testify to specific facts.
Had the testimony been presented below, the court might have refused
to accept it, if it determined that the witnesses were unqualified to
opine on the matters queried. *See, e.g., Herzinger v. Mayor and City
Council of Baltimore*, 203 Md. 49, 64, 98 A.2d 87 (1953) ("Many of the
questions asked called for legal conclusions by the witness, and none
was directed towards the actual findings of fact. The court sustained
objections to these questions, chiefly on the ground that the witness was
not qualified to answer them."). We are troubled greatly by appellants'
determination to push potentially inadmissible testimony under the
wire and present it in this Court as though it were part of the trial
record.

PBX is of no consequence. The testimony presented suggests that the choice of location was driven by considerations of convenience and security, but that is beside the point. We cannot believe that appellants would have dropped their opposition to IWIF's use of the Racal recorders had those recorders been located in a different room. The court below properly found, based on the undisputed evidence before it, that the hardware used for the recording of calls at IWIF was "telephone ... equipment ... furnished by the subscriber or user for connection to the facilities of the [wire communication service]."

## B

The second prong of the telephone equipment exception requires use of the recording equipment in the ordinary course of business. IWIF's use of the equipment clearly satisfied this prong of the exception.

The phrase "ordinary course of business" has the same meaning under the Maryland Wiretap Act "as it does in the myriad of other legal contexts in which it is used: an action is taken in the ordinary course of business if it is a routine activity of the business in furtherance of a legitimate business goal." *Arias*, 182 F.R.D. at 416 (citing *Management Techs. v. Morris*, 961 F.Supp. 640, 648 (S.D.N.Y.1997)); *cf. United States v. Murdock*, 63 F.3d 1391, 1397 (6th Cir.1995) (holding that wife's indiscriminate recording of all telephone calls to and from family-run funeral home violated the federal Act, when she recorded those calls for purpose of catching husband in activities that were illegal and threatening to the marriage); *O'Sullivan*, 687 N.E.2d at 1245 ("[T]he general rule is that monitoring business calls is legal, but eavesdropping on private calls is illegal unless 'is a legitimate business purpose' for the employer to monitor an employee's conversation. An employer may monitor by extension phone an employee's business-related calls as long as the employer offers a legitimate business reason that justifies such monitor-

ing.") (citing several cases). IWIF''s use of the Racal system unquestionably meets this definition.[11]

First, use of the system was routine. Once installed, the Racal recorders were used daily to monitor, record, and store every single call made on the designated lines without regard to origin, destination, or identity of the in-house or outside parties. Such indiscriminate and routine recording of "all activities on established designated lines ... is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications." *Jandak,* 520 F.Supp. at 822.

Second, IWIF''s use of the Racal recorders furthered a legitimate business goal—to control and improve the quality of service that IWIF''s representatives provide to its customers

---

11. In *Amati v. City of Woodstock,* 176 F.3d 952 (7th Cir.1999), the court examined which activities take place in the ordinary course of business, and which do not. The context for its evaluation was law enforcement, but the court concluded that each situation usually presents a fairly patent answer:

[T]he ordinary-course exclusion has its own domain. What that domain is, however, is a bit obscure.

Investigation is within the ordinary course of law enforcement, so if "ordinary" were read literally warrants would rarely if ever be required for electronic eavesdropping, which was surely not Congress's intent. Since the purpose of the statute was primarily to regulate the use of wiretapping and other electronic surveillance for investigatory purposes, "ordinary" should not be read so broadly; it is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations. (This interpretation may have much the same practical effect as the interpretation mentioned earlier in which "ordinary course" refers to recording calls on one's own line; for ordinarily when police record calls as part of an investigation they are recording calls on someone else's line.) Such recording will rarely be very invasive of privacy, and for a reason that does after all bring the ordinary-course exclusion rather close to the consent exclusion: what is ordinary is apt to be known; it imports implicit notice. To record all calls to and from a police department is, for the reasons explained earlier, a routine police practice. If "ordinary course" of law enforcement includes anything, it includes that. *The sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have incited many challenges. Id.* at 955–56 (citations omitted) (emphasis added).

and the public. We note that this is nearly the same legitimate business purpose as that approved by the Court in *O'Sullivan:*

NYNEX had a legitimate business interest in managing and monitoring the quality of telephone calls made by their telemarketers to NYNEX customers. NYNEX's interest in ensuring that the telephone calls made complied with the guidelines imposed by the telecommunications statutes [regulating telemarketing], coupled with the possible need to give further training and supervision to employees dealing with the public, supports this proposition.

687 N.E.2d at 1246. In fact, courts have commonly held that such use of a recording system meets the ordinary use prong of the telephone equipment exception. *See, e.g., Royal Health Care Services, Inc. v. Jefferson–Pilot Life Ins. Co.,* 924 F.2d 215, 218 (11th Cir.1991) (stating that its decision that the policy of recording all outgoing calls from a particular department was in the ordinary course of business was "an easy one," for "[a] review of the transcript of the call reveals that the entire call concerned charges by Royal Health for services provided to a patient insured by JP Life ... [and t]he only conclusion that may be drawn is that the call was intercepted in the ordinary course of business"); *Watkins v. L.M. Berry Co.,* 704 F.2d 577, 579–584 (11th Cir.1983) (holding that court had "no doubt" that a policy of "monitoring solicitation calls as part of its regular training program" was in ordinary course of business).[12]

---

12. Seeking to distinguish these cases, appellants cite *Sanders v. Robert Bosch Corp.,* 38 F.3d 736 (4th Cir.1994), which held that constant surreptitious monitoring, including eavesdropping on personal calls, ostensibly to prevent bomb threats, did not satisfy the second prong of the telephone equipment exception. Aside from having been criticized for faulty reasoning, *see Arias,* 182 F.R.D. at 414 n. 47, *Sanders* may be distinguished factually on a number of levels. For example, the majority in *Sanders* never accepted the premise that the defendant had been truthful about its real purposes in monitoring, and further, it conducted monitoring surreptitiously, without most employees' knowledge that recordings were being made. *Sanders,* 38 F.3d at 741–42. Here, IWIF management stated clear and consistent goals from the outset, and in fact, trained all employees in certain aspects of the monitoring program

Appellants' own pleading that the monitoring took place in the ordinary course of business, *see* 2d Am. Compl. ¶ 1 ("Upon information and belief, Defendant ... in its ordinary course of business, routinely taps the telephone conversations of all individuals communicating with Defendant *via* telephone."), arguably makes it impossible to contend otherwise now. The doctrine of estoppel by admission or by pleading alone should bar their assertion that IWIF's recording and monitoring activities do not take place in the ordinary course of business. *See, e.g., Van Royen v. Lacey,* 266 Md. 649, 652, 296 A.2d 426 (1972) (" 'A man shall not be allowed to blow hot and cold, to claim at one time and deny at another.' Accordingly, the appellees are now estopped by their own pleadings from contending anything other than that ....") (quoting *Edes v. Garey,* 46 Md. 24, 41 (1877)) (quoting *Cave v. Mills,* 7 H. & W. 927) [13]; *Wilson v. Stanbury,* 118 Md.App. 209, 214, 702 A.2d 436 (1997) (" 'one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.' ") (quoting *WinMark Ltd. Pshp. v. Miles & Stockbridge,* 345 Md. 614, 620, 693 A.2d 824 (1997)).

Appellants seek, nevertheless, to manufacture a dispute as to the material issue by attacking IWIF's retention period, which they assume is indefinite. They only cite, however, the testimony of one telephone technician operating the Racal equipment who stated that he did not know how many tapes existed or where they were stored. Such testimony could not reasonably have been used to infer indefinite storage. Al-

---

and provided unmonitored extensions for personal calls. The undisputed evidence shows that IWIF recorded calls because it simply wanted to improve the quality of communications between its agents and the public.

**13.** *Van Royen* deals with parties who stated in pleading that a conveyance of land had created joint tenancy, but later argued that the same conveyance had created tenancy in the entireties. That case cites several older cases for the doctrine, including *Stone v. Stone,* 230 Md. 248, 253, 186 A.2d 590 (1962); *Scanlon v. Walshe,* 81 Md. 118, 132, 31 A. 498 (1895); *Mobberly v. Mobberly,* 60 Md. 376, 379 (1883); *Hall v. McCann,* 51 Md. 345, 351 (1879).

though IWIF's chief operating officer testified that there existed a storage period for the tapes, the duration of which he did not know, appellants' claim that IWIF stored conversations "five years, ten years—and beyond" is totally baseless, *see* Appellants' Br. at 12, given that at the time this suit was filed, the recording system has been in place for less than three years. Furthermore, even if appellants *had* established that IWIF lacks a well-crafted policy for destroying recordings, they have not adduced *any* evidence from which the trial court could have inferred that the monitoring of calls for quality control is not a legitimate business practice. To the contrary, plenty of admissible evidence was set forth showing IWIF's actual purpose in recording calls and supporting the lower court's grant of summary judgment.[14] We will not allow appellants to manufacture a jury question out of the whole cloth of counsel's argument, when IWIF has presented sufficient grounds for summary judgment and appellants failed to establish the existence of any genuine issue of material fact below. *See Goodwich*, 343 Md. at 206–07, 680 A.2d 1067.

## C

Beyond IWIF's success in meeting the standard for summary judgment and appellants' failure to establish a jury issue, we note that appellants' stab at statutory interpretation defies common sense. Appellants argue that the Act delimits equipment covered under the telephone equipment exception to those devices "for the transmission of electronic communications"; the Racal recorders, of course, make no such transmissions. *See* § 10–401(4)(1) ("Any telephone or telegraph instrument, equipment or other facility for the transmission of electronic communications...."). Appellants' reading of the Act, however, would exclude *all* telephonic communications,

---

14. IWIF's on-site telephone technician described the purpose of the recording devices as "quality assurance." His supervisor said that the system had been installed "to promote quality." The chief operating officer of IWIF explained that the recorders had been installed to improve "the quality of service to our customers, be it the claimants [or] our policyholders."

which are not considered to be electronic communications, but wire communications instead. The Act provides that " '[e]lectronic communication' does not include . . . [a]ny wire or oral communication." § 10–401(11)(ii). On the other hand, " '[w]ire communication' means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception," a definition that, we note, describes perfectly ordinary telephone calls. § 10–401(1)(i). Thus, appellants' logic would proscribe the telephone equipment exception as courts now enforce it. We cannot imagine that our legislature intended that result, and we will not repudiate the interpretative efforts of several panels that have preceded us.[15]

 Further, appellants' suggested interpretation renders the words "telephone or telegraph instrument [or] equipment" surplusage, violating the rule of construction that holds all parts of a statute should be given functional meaning. *See, e.g., Office of People's Counsel v. Maryland PSC,* 355 Md. 1, 22, 733 A.2d 996 (1999) ("We are . . . required to interpret the statute as a whole, for '[w]here the statute to be construed is a part of a statutory scheme, the legislative intention is not

---

15. To the contrary, following changes to the federal Act in 1986, Maryland's Wiretap Act was amended in 1988 to *expand* the coverage of the existing statute to include electronic communications such as internet service and email. *See* Senate Judicial Proceedings Comm., Bill Analysis, Senate Bill 679, at 4 (1988) ("With few exceptions . . . the proposed Maryland Bill tracks the Model Act prepared by the Department of Justice to assist states in conforming their legislation to the Federal Act."). The federal Electronic Communications Privacy Act of 1986 ("ECPA") extended federal wiretap coverage to new types of non-telephonic or telegraphic communications. *See* S.Rep. No. 99–541, at 2, U.S.Code Cong. & Admin.News 1986 at p. 3556 ("As Senator Leahy said when he introduced [this bill] . . . the existing law is 'hopelessly out of date.' It has not kept pace with the development of communications and computer technology. Nor has it kept pace with changes in the structure of the telecommunications industry."). After the ECPA passed, states had two years to enact statutes governing the monitoring of electronic communications before federal preemption took effect. *Id.* at 49. Maryland's 1988 revisions were enacted with that intention. *See* Bill Analysis, *supra,* at 1.

determined from that statute alone, rather it is to be discerned by considering it in light of the statutory scheme.' Moreover, neither the words in the statute nor any portion of the statutory scheme should be read 'so as to render the other, or any portion of it, meaningless, surplusage, superfluous, or nugatory.'") (quoting *Government Employees Ins. Co. v. Insurance Com'r,* 332 Md. 124, 132, 630 A.2d 713 (1993)); *Suburban Hosp., Inc. v. Maryland Health Resources Planning Comm'n,* 125 Md.App. 579, 583, 726 A.2d 807 (1999) ("Viewing terms as surplusage is a disfavored method of statutory construction. Statutes should be read 'so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory.'") (quoting *Montgomery County v. Buckman,* 333 Md. 516, 523–524, 636 A.2d 448 (1994)) (citations omitted). It also flies in the face of the common grammatical rule stating that a qualifying clause ordinarily defines only those words or that phrase immediately preceding it, especially in the absence of an intervening comma before the qualifying clause. *See Sullivan v. Dixon,* 280 Md. 444, 451, 373 A.2d 1245 (1977). If a qualifying phrase—here, "for the transmission of electronic communications"—is to apply to all antecedents rather than simply the last one, then it must be separated from those antecedents by a comma. 2A J.G. Sutherland, *Statutes and Statutory Construction* § 47.33 (Norman J. Singer, ed., 6th ed.2000); *see also Sullivan,* 280 Md. at 451, 373 A.2d 1245 (citing to *Webb v. Mayor and City Council of Baltimore,* 179 Md. 407, 409–10, 19 A.2d 704 (1941); 4th edition of Sutherland). Thus, the prepositional phrase in controversy modifies only the word "facility," and definitely not the preceding words "telephone or telegraph instrument." [16] Because the Racal recorders were indeed part of IWIF's telephone equipment and were used for legitimate business purposes, they fall under the telephone equipment

---

16. As the sentence is punctuated, we assume that the prepositional phrase could also modify the word "equipment." Placing "equipment ... for the transmission of electronic communications" under the telephone equipment exception is consistent with the 1986 revisions to the federal Act. *See supra* note 15.

exception, and the court properly granted summary judgment to IWIF. We affirm.

II

We now turn to appellants' second issue, whether the court below erred when it accepted IWIF's Answer to appellants' Second Amended Complaint. Summary judgment briefs were due on February 4, 2000, with the hearing for summary judgment scheduled for March 9. On January 18, 2000, appellants amended their complaint, restoring the prayer for liquidated damages, which had been inadvertently omitted from their First Amended Complaint. IWIF failed to answer the Second Amended Complaint until February 17. Appellants contend, as they did below, that IWIF's Answer should be barred by Maryland Rule 2–341. We disagree and hold that the court below did not err in accepting the Answer.

The decision to permit an amendment to an answer "rests within the sound discretion of the trial judge, and this discretion is subject to review on appeal only for its abuse." *Mattvidi,* 100 Md.App. at 83, 639 A.2d 228. Amendments to an answer are "to be freely allowed when justice so permits" and denied "only if 'prejudice to the opposing party or undue delay results.'" *Id.* (quoting Md. Rule 2–341(c); *Robertson,* 271 Md. at 710, 319 A.2d 816).

The court below was well within its discretion. We agree that the only material difference between appellants' First and Second Amended Complaints was the reinstatement of the prayer for liquidated damages that appeared in the original Complaint but was omitted in the First Amended Complaint. Although appellants claim they "introduced new facts and varied the allegations ... in a material respect," our side-by-side comparison of the two pleadings shows that, aside from the added prayer, they are substantially the same. Thus, as the court below found, IWIF's responses to appellants' allegations and prayer for damages were already on the record.

Second, like the court below, we find that appellants suffered no prejudice resulting from the two-week delay in filing

IWIF's Answer.[17] As the docket sheet clearly shows, during that two-week period, the only activity that could have consumed appellants' time, other than preparing their motion to strike, was the ongoing preparation of briefs and arguments for the summary judgment motions. Because appellants amended only the remedy they sought, and not the allegations they intended for that remedy to redress, the amendment—and the Answer—had *no* effect upon their ability to produce a memorandum of points and authorities. Notably, appellants failed to make *any* allegation of prejudice, much less set forth any grounds from which we could infer it. We thus affirm.

## III

Finally, appellants ask whether the court below erred when it allowed IWIF to amend several affidavits to cure alleged format deficiencies that did not change the substance of the affidavits. The court allowed the affidavits to be modified because they failed to state specifically that the affiants were competent to testify to the matters stated therein. The other affidavit content, however, showed that the affiants were, in fact, competent to attest to the subject matter. Again, we answer "no" to appellants' question and explain.

Maryland Rule 2–342 states that "any motion or other paper may be amended" with leave of court and upon any terms that the court might impose. As with amendments to the answer and other pleadings, *see supra*, the court may allow modifications in its discretion, and such discretion may be exercised liberally, provided that other parties are not prejudiced. *See Ski Roundtop*, 79 Md.App. at 371, 556 A.2d 1144 ("it would most likely have been an abuse of discretion not to allow" amendment of interrogatory answers). Here, amendment of the affidavits did not alter their substantive content, but instead was intended to cure mere technical

---

17. Under Rule 2–341(a), the Answer would have been due February 2. It was received February 17, instead.

defects, namely, to insert the phrase "to the best of that knowledge," after the affirmation that the facts "are based on my personal knowledge and are true and accurate." Such language would not, and did not, affect the substance of the facts to which the affiants attested, and notably, appellants do not claim that it did—nor can they.[18] To the contrary, appellants had a full and fair opportunity to respond to the substance of the affidavits, and they did so. They deposed all IWIF employees who submitted affidavits, and we note, their testimony was consistent with that set forth in the affidavits. Relying on the substance of the affidavits, they filed multiple briefs opposing IWIF's motion for summary judgment and participated in oral arguments. Because appellants cannot claim that the modification prevented them from knowing the substance of the affidavits, the court below found no prejudice, and neither can we. We affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

---

**18.** Appellants also argue that inclusion of that phrase contradicts the requirement of Maryland Rule 2–501(c) that all affidavits be "made upon personal knowledge." That argument is so weak that it barely requires acknowledgment. Not only do the affidavits in question state twice that they are based upon personal knowledge, but the total statement of affirmation, that the affiant had spoken and his statement were "based upon my personal knowledge and are true and accurate to the best of that knowledge," fully satisfies Rule 2–501(c). It states quite directly that the affiant spoke from *personal* knowledge. In contrast, the affiant's statement in *Webb v. Joyce Real Estate,* 108 Md.App. 512, 520, 672 A.2d 660 (1996), that his statements were made "to the best of [his] knowledge, information and belief," does not assert, but merely implies, personal knowledge and thus fails to meet the requirements of Rule 2–501(c).