# United States Court of Appeals

## For the First Circuit

No. 08-1534

THOMAS WALDEN, et al.,

Plaintiffs, Appellees, Cross-Appellants,

v.

CITY OF PROVIDENCE, RHODE ISLAND, by and through its Treasurer,
STEPHEN NAPOLITANO; DAVID CICILLINE, in his official capacity as
Mayor and Acting Public Safety Commissioner for the City of
Providence; COLONEL DEAN ESSERMAN, in his official capacity as
the Chief of Police for the City of Providence,

Defendants, Appellants, Cross-Appellees.

No. 08-1535

THOMAS WALDEN, et al.,

Plaintiffs, Appellees, Cross-Appellants,

v.

MARY LENNON, individually and in her former official capacity as
the Chief of Operations of the Communications Department,

Defendant, Appellant, Cross-Appellee.

No. 08-1536

THOMAS WALDEN, et al.,

Plaintiffs, Appellees, Cross-Appellants,

v.

MANUEL VIEIRA, individually and in his former official capacity
as the Communications Director,

Defendant, Appellant, Cross-Appellee.

No. 08-2417

THOMAS WALDEN, et al.,

Plaintiffs, Appellees, Cross-Appellants,

v.

CITY OF PROVIDENCE, et al.,

Defendants, Appellants, Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Lincoln D. Almond, <u>U.S. Magistrate Judge</u>]

Before

Lynch, <u>Chief Judge</u>,
Boudin, <u>Circuit Judge</u>, and Saylor,[*] <u>District Judge</u>.

<u>Carolyn A. Mannis</u> with whom <u>Mark A. Fay</u> was on brief for the appellees/cross-appellants.
<u>Kevin F. McHugh</u>, Senior Assistant City Solicitor, with whom <u>Joseph M. Fernandez</u> City Solicitor, and <u>Michael A. Calise</u>, Assistant City Solicitor, were on brief for the appellants/cross-appellees City of Providence, David N. Cicilline, and Dean Esserman.
<u>Peter J. Comerford</u> with whom <u>Coia & Lepore, Ltd.</u> was on brief for the appellant/cross-appellee Manuel Vieira.
<u>Dean G. Robinson</u> for the appellant/cross-appellee Mary Lennon.

February 23, 2010

[*]Of the District of Massachusetts, sitting by designation.

**LYNCH**, <u>Chief Judge</u>.  In July 2004, two groups of current and former employees of the Police and Fire Departments of the City of Providence, Rhode Island, and their families, sued the City and several City employees in their personal capacities.  An automatic recording system at the City's new Public Safety Complex ("Complex"), which housed the Police and Fire Departments, recorded all telephone calls into and out of the Complex from the time the telephone system began operating in May 2002 until February 2003.

Plaintiffs claimed these defendants were responsible for putting the recording system in place and that the recording of the calls violated their rights.  Specifically, plaintiffs claimed the recordings violated their Fourth Amendment rights under the United States Constitution and Rhode Island's equivalent constitutional provision, Article I, Section 6; the federal wiretap statute, 18 U.S.C. § 2511 et seq.; Rhode Island's wiretap laws, R.I. Gen. Laws §§ 11-35-21, 12-5.1-13; and the state's privacy act, <u>id.</u> § 9-1-28.1. None of the defendants ever listened to any of the plaintiffs' calls, nor do plaintiffs claim otherwise.

The first group of plaintiffs, the "Walden plaintiffs," consists of 116 current and former employees of the Providence Fire Department who worked in the Complex and their family members.  The second group, the "Chmura plaintiffs," consists of nineteen current and former civilian and sworn police officer employees of the Providence Police Department who worked in the Complex.  The two

plaintiff groups brought suit together and were represented by the same counsel.

The individual defendants were Manuel Vieira, Director of the City's Department of Communications until February 2003, and Mary Lennon, Chief of Operations in the Department of Communications until February 2003. Urbano Prignano, who was Chief of Police in Providence until his retirement on January 31, 2001, was dismissed from the case following the presentation of plaintiffs' evidence.[1]

Following a twenty-six-day trial in February and March 2008, a jury found defendants liable, and plaintiffs were awarded over $1 million in damages and attorney's fees. The City, Vieira, and Lennon now appeal, challenging, inter alia, the district court's denial of their Fed. R. Civ. P. 50 motions for judgment as a matter of law on qualified immunity and municipal liability, as well as errors in the jury instructions and verdict forms.[2]

We find defendants are entitled to qualified immunity on some claims, vacate the jury verdicts, and direct entry of an order

---

[1]  Also sued in their official capacities were the Mayor of Providence, David Cicilline, and the City's Chief of Police, Colonel Dean Esserman. We refer to them with the City of Providence collectively as "the City."

[2]  Plaintiffs also cross-appeal, raising claims about the district court's denial of prejudgment interest for the state wiretap damages and its failure to require both the City and Vieira each to pay the full damages amount, instead of treating the damages as joint-and-several, under the state wiretap act.

of dismissal with prejudice of all federal claims. As to the pendent state claims, the state wiretap act claims against the City are dismissed with prejudice. We dismiss without prejudice the verdict under the state wiretap and privacy act against Vieira and do the same as to the verdict under the privacy act against Lennon and the City.

I.

To the extent relevant to the issues on review, we review the facts of this case in the light most favorable to the jury's verdict. Cruz-Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 275 (1st Cir. 2003).

This case concerns the recording of calls at the City's new Public Safety Complex, which opened in 2002 to house parts of the City's Department of Public Safety. That department is run by a City Commissioner and contains the Police Department, headed by the Chief of Police; the Fire Department, headed by the Fire Chief; and the Department of Communications, headed by a Director. See City of Providence, Home Rule Charter ("Charter"), art. X, § 1001, available at http://library8.municode.com/default-test/home.htm?infobase=14446&doc_action=whatsnew. The Complex was built to provide office space for the Commissioner, the Chief of Police, and the Fire Chief, and their staffs, as well as to contain a police station and a fire station.

A.  Policies and Practices as to Recording Calls before the
    Complex Opened

Before the Complex opened, the City already recorded calls made by public safety employees at the Emergency Operations Center ("EOC") as a matter of policy.  The EOC served both the Police and Fire Departments but was physically separate from the police and fire stations around the City; it would route emergency calls to the relevant facility when required.  Emergency calls and responses, calls about information from the National Crime Information Center and vehicle registry checks, and the talk-around channel on the police radio frequency were all recorded through a Dictaphone system at the EOC, covering fifteen to twenty lines in all.  EOC employees were informed when they began their jobs that their conversations would be recorded and potentially reviewed.[3] The EOC was not relocated to the new Complex.

Before the summer 2002 move to the Complex, the central Police and Fire Departments were located at two separate facilities within the City's old Public Safety Center.  The telephone calls at both of these facilities were not recorded.

The old telephone system for the police operated differently than did the new system at the Complex.  There was a

_____

[3]    There was also a written policy that governed when recorded calls could be listened to.  This policy required parties to fill out a written request to review a tape.  This request then had to be approved by both the Internal Affairs unit of the Police Department and by Vieira: only then would employees of the Department of Communications provide the requested recording.

central station area where a desk sergeant sat and where clerks answered telephone calls to the station. Some calls were routed from the City's EOC; others were emergency and nonemergency calls that came directly to the station. Some employees used the phone for law enforcement and administrative work and had their own telephone lines. Others used shared lines. Police Department employees also regularly used the phones for personal calls.

The setup at the firefighters' old facility was different. This facility contained telephones that could only be used to make calls between the different fire stations. Emergency calls were not routed to the station through the telephones but rather through an intercom system that broadcast to everyone at the station. There was also a separately installed telephone that the firefighters themselves arranged with the telephone company and paid for so that they could make personal calls while on duty at the station.

B. The New Public Safety Complex

Construction and planning for the new Complex began more than a year and a half before it opened. Among the intended features of the Complex was a state-of-the-art telephone system, with a number of functions, including call recording.

The specifications for this new telephone system, including plans for a recording system, were discussed during planning meetings. Members of the Police Department command staff

attended these planning meetings, as did the Police Chief on occasion,[4] representatives from the Fire Department, the Finance Department in City Hall, the Planning Committee, architects and engineers, and defendant Vieira, who had been Director of Communications since 1993. The meetings were held in the office of the Commissioner of Public Safety, John Partington, who sometimes attended as well.

It was decided at these meetings that the new Complex should include a telephone system capable of recording calls to and from the Police and Fire Departments. Attendees Vieira and Major Dennis Simoneau, the commander of all uniformed police officers, testified to several reasons for this decision. First, planners wanted a system that could record emergency calls that came in on lines other than 911 lines.[5] Second, a recording system was needed to enable monitoring of how public safety employees were handling calls from the public, including on nonemergency lines, so that citizen complaints about public safety officials' behavior on these lines could be investigated. Third, the telephone system needed a cost-accounting feature to reduce costs and prevent employees from abusing their phones. Under the old system, public safety employees' personal long distance calls and calls to sex lines cost

---

[4]    Prignano was Police Chief when planning for the Complex began and attended some of the initial meetings.

[5]    For purposes of this opinion we use the word "line" and the word "extension" interchangeably.

the City $5,000 to $6,000 a month. Fourth, the experience of New York City's public safety officers following the terrorist attacks on September 11, 2001, had underscored the desirability of a redundant system that could, in the event that a component of the communications system failed, maintain direct communication among police, fire, hospital, and emergency response agencies, including internal calls between lines on the system. This would include backup for the recorded EOC system, necessitating recording at the Complex.

With these parameters in mind, members of the City's Department of Communications developed a request for proposals ("RFP") for the telephone system at the Complex so that the Board of Contract and Supply could start the usual open process of selecting a vendor through public bidding. Providence's Board of Contract and Supply, chaired by the City's Mayor, is in charge of awarding contracts for any City purchases above $5,000. Charter, art. X, § 1007. Vieira approved the RFP and sent it to Alan Sepe, Acting Director of the City's Department of Public Property. In that capacity, Sepe was both a member of the Board of Contract and Supply and the head of the department that shepherded the RFP process for the City. The Board of Contract and Supply voted to approve the RFP and publicly advertised it in August 2001. The RFP stated that "[t]he Board of Contract and Supply will make the award

to the lowest responsible bidder who submits [the] bid" and that the Board also "reserves the right to reject any and all bid(s)."

Because the Department of Communications forgot to include the request for a recording system in the RFP, Vieira, at Sepe's behest, later requested in writing that the specifications for the recording system also be put out to bid. A supplemental RFP for the recording system was released on October 29, 2001, without further involvement from Vieira, and was again made public.

On November 5, 2001, the Board of Contract and Supply received six bids from various vendors, which the board initially reviewed and made public. The bids were then forwarded to Vieira, who consulted with his staff and discussed the bids with his superior, the Commissioner of Public Safety, before making recommendations.

On January 8, 2002, Vieira recommended to Sepe that the City accept the proposal submitted by a company called Expanets, because it "was the only vendor who met the requirements of the RFP," namely the desired redundant backup and recording features. The proposed recording system, Expanets' Total Recall system, was capable of digitally recording and storing all inbound and outbound calls on the telephone system. Expanets' bid also specified that it and not the City would be responsible for implementing the proposed system. The total cost of the bid, including both the telephone system and the recording system, was $971,664.

-10-

Sepe immediately forwarded Expanets' proposal to the Mayor with his own cover letter recommending that it be accepted. After the Board of Contract and Supply, including Sepe and the Mayor, publicly voted on the bid, Expanets was awarded the contract. Sepe testified that he voted to award the contract to Expanets because "they were the lowest responsible bidder that met the specifications and could perform the services of the RFP."[6] Vieira was not a member of the Board and could not vote to award Expanets the contract.

The Expanets telephone system was installed at the Complex by Expanets technicians and began operating on May 23, 2002. It also included the Total Recall system, which started recording all phone lines that day, well before anyone had moved into the building or begun using the phone lines.

The cost-accounting feature also began operating on that date. Vieira testified that the Total Recall system was required not only to record calls but also for the desired cost-accounting feature to function, a fact plaintiffs disputed. The cost-accounting and Total Recall systems were separate functions, and the databases that stored the cost-accounting data and the recordings were separate as well.

---

[6] Plaintiffs' theory was that the competitive bidding process was a sham and was designed to give the contract to Expanets.

These functions had all been active for some time when the occupants moved into the Complex in July and August 2002. Specifically, the Total Recall system had been recording approximately 690 lines, located throughout the Complex and configured for the Police and Fire Department and their associated staffs.

The phone lines recorded at the Police Department had a range of configurations and uses. There was a central station area with several shared lines, where a desk sergeant sat and several clerks received emergency and nonemergency calls from the public. Some police officers and administrative officials had their own offices with individual phone lines, which they used to make calls on both law enforcement and administrative matters. Finally, there were also shared lines in shared office spaces used by Police Department employees for police business. All of the testifying Chmura plaintiffs said they also used these lines to make personal calls.

On July 22, 2002, shortly after the Police Department moved to the Complex, Major Simoneau e-mailed all sworn police officers and civilian employees of the Police Department. He informed recipients "that all lines in the new station" would be recorded and employees should "speak professionally at all times."

He also asked desk sergeants to "alert all of [their] clerks of this fact," in case they did not receive the e-mail.[7]

Unlike the Police Department, the Fire Department did not alert staff about the recording system. The recorded phone lines at the Fire Department also had multiple configurations and uses. There were individual lines for members of the departmental leadership housed in the Complex. Several internal extensions were installed to call other fire stations but did not permit external calls. After relocating to the Complex in August 2002, plaintiff Thomas Walden had the telephone company move to the new facility the firefighters' personal telephone line, which they paid for and used to speak with their families. Unlike in the old building, where the telephone company had physically installed the separate line, the personal line was routed through the Complex's telephone system and into the telephones in the firefighters' space. When the telephone company did this, the line was automatically recorded by the Total Recall system.[8]

Soon after the move, Lennon and several technicians who she supervised attended training sessions on the Total Recall

_____

[7] A copy of the e-mail was put into evidence, and defendants provided three witnesses who testified they received it. The Police Department plaintiffs testified they did not receive the e-mail.

[8] Defendants disputed whether this line was recorded. Plaintiffs' expert testified it was recorded and we take that to be true. It was also disputed whether defendants intended that the personal line be recorded.

system and were given system passwords along with a list of lines recorded. In late July 2002, Vieira requested that his employees remove ten telephone extensions from the recording system, and Lennon received an e-mail informing her when the task was completed. This was not done pursuant to a written policy; indeed there was no written policy governing which lines were recorded or removed from the system.[9] Instructions to remove lines came initially only from Vieira or his deputy. Among the twenty extensions removed from the system during the system's operation were lines to Vieira's own office and residence, the lines to his deputy and to his administrative assistant, and the line to the residence of the Police Chief.[10]

In January 2003, The Providence Journal asked the Fire Department for recordings of 911 and interdepartment calls regarding a drowning. Fire Department Chief Guy Lanzi consulted with Senior Assistant City Solicitor John T. D'Amico about the request, at which point D'Amico learned of the recordings for the

---

[9] Although persons wishing to listen to recorded conversations were required to fill out written requests, as had been the practice with the Dictaphone system, Lennon, who was responsible for retrieving the recorded conversations, testified that she was not aware of a written policy governing when calls captured by the Total Recall system could be listened to and did not know if the written requests were reviewed by Internal Affairs.

[10] Vieira's office was not physically located in the Complex. However, the telephone system at the Complex was set up so that employees could reach phones at these locations, among others, by an internal extension, rather than getting an outside line.

-14-

first time. In a January 22, 2003 letter to Chief Lanzi, D'Amico recommended an inquiry into which phone lines were being recorded and warned that "[d]epending on circumstances (e.g., which telephone is being recorded), the recording may be unlawful" and "depending on the circumstances, if appropriate, [recording on those lines] should be discontinued or the users notified."[11]

During these consultations, Fire Chief Lanzi learned that his telephone line and other Fire Department leadership lines were recorded. Lanzi directly contacted Anthony Desmarais, a technician in the Department of Communications to request the lines be removed. Soon thereafter, Desmarais removed the Fire Department leadership's extensions from the recording system at the instruction of Vieira.

In February 2003, the City's new Police Chief, Dean Esserman, learned of the recordings, and on February 10, 2003, at Esserman's order, the Total Recall System was completely

---

[11]    Vieira testified that, until this investigation, he was unaware that the Total Recall system was recording any telephone calls at the Complex beyond those into the central station. He testified that his earlier instructions to employees were only to remove lines from the cost-accounting system. These assertions were expressly contradicted at trial by Department of Communications employees, including Vieira's administrative assistant and a technician responsible for removing lines from the recording system. We accept plaintiffs' version but note that none of this affects the City officials' assertion that they did not intend to record the firefighters' personal line or know that the line was being recorded.

-15-

deactivated and stopped recording all lines at the Complex. On the same day, Vieira and Lennon left their employment with the City.

A state investigation followed. The state Attorney General's Office concluded that there was no evidence that any of the calls recorded were listened to "without the consent of a call participant or for a criminal, malicious, or non-business-related reason." The Attorney General's Office further concluded that the use of the Total Recall System fell within the "ordinary course of business" exception to the state and federal wiretap statutes.[12]

Between May 2002 and February 2003, the Total Recall system created and archived approximately 750,000 audio files of recorded telephone conversations. Of these recordings, only three were ever listened to and those calls are not at issue in this case.[13]

---

[12] Although the investigation and Esserman's order were not permitted into evidence before the jury at trial, pursuant to a motion in limine by defendants, these facts were raised and considered on the defendants' motions for summary judgment, which claimed qualified immunity and that there was no municipal liability. The district court was also aware of them when making its later rulings.

[13] In one instance, the Fire Chief listened to a call to determine how the Fire Department handled a potential drowning in response to a complaint. Major Simoneau also listened to a call about the towing of a car, this time in response to a complaint about how the officer in charge of the towing had spoken to the car owner on the phone. Finally, a City Councilman listened to a call he had with a city employee to determine whether he had been threatened by the employee.

II.

Plaintiffs filed a six-count complaint in the federal district court in Rhode Island on July 20, 2004. Both the Walden firefighter plaintiffs and the Chmura police plaintiffs alleged, under 42 U.S.C. § 1983, that defendants violated their Fourth Amendment rights under the United States Constitution and that defendants violated their rights Rhode Island's equivalent constitutional provision, Article I, Section 6. Plaintiffs also claimed defendants violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("federal wiretap act"), 18 U.S.C. § 2511. Finally, plaintiffs alleged the defendants violated two state wiretap provisions, R.I. Gen. Laws §§ 11-35-21, 12-5.1-13, and the state's privacy act, id. § 9-1-28.1. Plaintiffs sought attorney's fees for all counts.

After extensive discovery, defendants filed motions for summary judgment on September 14, 2006, claiming that they had not violated plaintiffs' rights, that individual defendants were entitled to qualified immunity, that municipal defendants could not be liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), and that any recording that did take place was not illegal under federal and state statutes.

On July 6, 2007, the district court denied defendants' motions for summary judgment. It held that there were genuine issues of material fact as to whether the individual defendants

-17-

were liable for Fourth Amendment violations and denied individual defendants' claims of qualified immunity. Walden v. City of Providence, 495 F. Supp. 2d 245, 255-58, 267-70 (D.R.I. 2007). Specifically, the court found there was a clearly established general right of privacy in phone conversations, and that no reasonable government official could have concluded at the time that their actions were permissible. Id. at 267-70. It also held that the City could face municipal liability because Chief of Police Prignano was a final policymaker whose actions could be attributed to the City and a genuine question existed as to his liability. Id. at 267-70. For similar reasons, the district court concluded that there were genuine issues with regard to the claim under the federal wiretap act[14] and rejected the City's argument that municipalities could not be liable under the act. Id. at 261-62, 265-66. Finally, the court concluded that plaintiffs could proceed on their pendent state law claims. Id. at 270-71.[15]

The jury trial started on February 13, 2008. Plaintiffs presented evidence for twenty-one days, with the Walden firefighter

---

[14] The district court held that whether defendants fell under the "ordinary course of law enforcement" exception to the act, 18 U.S.C. § 2510(5)(a)(ii), could only be determined based on facts developed at trial. Id. at 263.

[15] On January 3, 2008, the parties consented to proceed under the jurisdiction of a magistrate judge, pursuant to 28 U.S.C. § 636(c). The case was accordingly reassigned.

plaintiffs going first and the Chmura police plaintiffs second. Nearly all plaintiffs in both groups testified.

Plaintiffs' case, as presented, was that defendants were responsible for illegally recording all calls that the Walden and Chmura plaintiffs had made and received from the Complex. Plaintiffs' counsel underscored in his opening argument that all of plaintiffs' claims centered on defendants' recording of all their calls, not on the theory that anyone ever listened to the recordings. Plaintiffs asserted in their individual testimony that they had an expectation of privacy as to all calls that they made, whether they were emergency calls, calls involving other police or firefighter business, or personal calls. Counsel's closing again cited the recording of all of plaintiffs' calls as defendants' unlawful conduct.

Plaintiffs also framed their specific legal claims around this proposition. Plaintiffs' Fourth Amendment, Rhode Island Constitution, and state privacy act claims all turned on the theory that plaintiffs had a general right of privacy in all phone conversations at the Complex. They did not differentiate between the police and firefighter groups or make particularized arguments about individual expectations of privacy within those groups. Their state wiretap act claims similarly asserted that defendants could not legally record any of plaintiffs' calls, regardless of

whether the calls involved emergency calls, law enforcement matters, or personal calls.

Likewise, the court's initial statements to the jury referred to the claim that the recording of all calls violated various laws. The court made no distinctions between emergency calls, calls from the public regarding police business that the City might wish to monitor in order to respond to complaints, or personal calls. Nor did it otherwise distinguish between types of calls or callers.

At the close of plaintiffs' case, all three defendants made motions for judgment as a matter of law under Fed. R. Civ. P. 50(a). The individual defendants argued that they were entitled to qualified immunity, that they fell within the exceptions to the wiretap statutes, and that plaintiffs' evidence failed to meet their burden of proof. Additionally, the City argued that plaintiffs could not establish municipal liability because the decision to install and implement the recording system was not taken by a final policymaker and the wiretap statutes did not apply to municipalities.

The court reserved ruling until later in the trial on Vieira's, Lennon's, and the City's motions. It dismissed the claims against Police Chief Prignano. It nonetheless concluded that this did not require it to grant the City's Rule 50 motion, even though the court had previously identified Prignano as a final

policymaker whose decisions could be attributed to the City. Instead, the court held as a matter of law that now Vieira was the City's final policymaker for the decision to install and implement the Total Recall recording system and that the City was responsible for his actions.

Defendants then presented their case. Their basic theory was that the Total Recall system, along with the rest of the telephone system, was installed to address legitimate law enforcement and cost-accounting needs. Defendants argued that they never intended to record all calls at the Complex. They emphasized that at least the police plaintiffs had been notified of the recordings and that defendants did not intend to record the firefighters' personal line, which they said had been installed at the Complex without the defendants' knowledge or involvement.

Defendants also pointed to plaintiffs' failure to provide evidence as to any specific calls that were recorded. They said that plaintiffs' assertion that their rights were violated simply because they used the telephone system was insufficient and that plaintiffs needed to introduce evidence about specific calls. Defendants also criticized plaintiffs' failure to make a particularized case as to plaintiffs' expectations of privacy, since each plaintiff made calls under different circumstances and their expectations of privacy would have varied.

Following their presentation of evidence, defendants renewed their Rule 50 motions. On the same day, the court required plaintiffs to elect whether to proceed to a jury verdict on the state or federal wiretap claims.[16] Plaintiffs, relying on previous rulings that damages were mandatory under the state statute but discretionary under the federal one, elected to proceed under state law.

Before the jury was charged on March 24, 2008, defendants objected to the jury instructions and the proposed verdict form. The court overruled their objections. The court's instructions to the jury again referred to defendants' recording of all of plaintiffs' calls in and out of the Complex. The instructions made no effort to exclude or distinguish emergency calls or calls from the public regarding police business that the City might wish to monitor. Nor did the instructions distinguish among different types of calls when describing potential defenses. The instructions also did not indicate to the jury whether it could treat the firefighters' personal line separately.

---

[16] The court did so pursuant to a November 2007 order on the defendants' motions in limine on damages, in which the district court had held that because the federal and state wiretap claims were parallel and would lead to duplicative damages, plaintiffs were required at the close of trial to elect whether to seek damages afforded by 18 U.S.C. § 2520 or those afforded by R.I. Gen. Laws § 12-5.1-13. Walden v. City of Providence (Walden I), Nos. 04-304A, 04-553A, slip op. at 3 (D.R.I. Nov. 30, 2007).

The jury received separate verdict forms for the Walden firefighter plaintiffs and the Chmura police plaintiffs. Both forms also presented plaintiffs' claims broadly and did not permit the jury to differentiate between the types of calls each plaintiff made or received.[17]

On March 26, 2008, the jury found against Vieira and the City on all counts, and against Lennon on the constitutional and privacy act claims. Each plaintiff in both plaintiff groups was awarded $1 in nominal damages for the constitutional claims, as well as $1 for the privacy act claim and $1 for one of the state wiretap claims, R.I. Gen. Laws § 11-35-21. One dollar in punitive damages was also awarded to each plaintiff for the constitutional violations, to be paid only by Vieira and Lennon.

Vieira and the City were also ordered, jointly and severally, to pay statutory damages of $100 to each plaintiff for every day on which the plaintiff made telephone calls that were recorded, pursuant to one of the state wiretap act claims, id. § 12-5.1-13(a). The jury found that all of the Chmura police

_____

[17] Specifically, on the constitutional and privacy act claims, the forms simply asked the jury whether each defendant had violated all plaintiffs' rights within that group. On the wiretap act claims, the forms required the jury to find for all plaintiffs and against each defendant if the defendant had intercepted "any of [p]laintiffs' telephone calls." The same was true of the jury forms' presentation of the defendants' defense that the calls were in the course of law enforcement work, which only allowed the jury to find for all plaintiffs or all defendants. We describe these forms in greater detail below.

plaintiffs and some of the Walden firefighter plaintiffs had their calls intercepted, but also concluded that seventy-one of the Walden plaintiffs, including all of the firefighters' family members, could not establish their calls were recorded on any day. Statutory damages under this count amounted to $526,700.  As the prevailing party under 18 U.S.C. § 1988, plaintiffs were also awarded attorney's fees and costs, totaling $539,452.37.[18]  Walden v. City of Providence (Walden III), Nos. 04-304A, 04-553A, slip op. at 1 (D.R.I. Oct. 15, 2008).  Defendants timely renewed their Rule 50 motions after the verdict, pursuant to Fed. R. Civ. P. 50(b).

On May 15, 2008, the court denied defendants' Rule 50 motions.  It declined to reconsider its finding that Vieira was a final policymaker for purposes of the City's municipal liability. Walden v. City of Providence (Walden II), Nos. 04-304A, 04-553A, slip op. at 14-17 (D.R.I. May 15, 2008).  It also denied qualified immunity to Lennon and Vieira, ruling that "no reasonable official" could have concluded that the recordings were permissible.  Id. at 18-19.

Defendants now appeal the denial of their summary judgment and Rule 50 motions on qualified immunity, municipal

---

[18]    Plaintiffs sought attorney's fees and costs under federal law, 18 U.S.C. § 1988, Fed. R. Civ. P. 54(d), D.R.I. Local Rule 54.1, and the state wiretap and privacy acts, R.I. Gen. Laws §§ 12-5.1-13, 9-1-28.  Although the district court only analyzed the claim under federal law, plaintiffs claimed at oral arguments they were also entitled to fees on state law grounds.

liability, and the applicability of the wiretap statute to the City as a municipality and to all three defendants. They also claim error in several of the district court's evidentiary rulings, its jury instructions and verdict forms, and rulings on attorney's fees. Defendant Lennon further claims that the verdict was inconsistent and that the evidence was insufficient to find her liable.

III.

A. Appeals from Verdicts for Plaintiffs on U.S. Constitution Fourth Amendment Claims

1. Qualified Immunity for Defendants Vieira and Lennon

We first consider whether Vieira and Lennon were entitled to qualified immunity. The defendants have preserved their objections to the district court's denial of immunity. Plaintiffs do not seriously contend otherwise.[19]

Our review of the denial of qualified immunity is de novo. Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 525 (1st Cir. 2009). To the extent it is relevant, we review the evidence in the light most favorable to the jury's verdict. Id. We conclude the court erred in denying the individual defendants qualified immunity.

_____

[19] Plaintiffs argue that the individual defendants abandoned any claim to qualified immunity when they failed to take an interlocutory appeal from the denial of the summary judgment motion. That is plainly incorrect. See Wilson v. City of Boston, 421 F.3d 45 (1st Cir. 2005); Iacobucci v. Boulter, 193 F. 3d 14, 23 (1st Cir. 1999).

Officials are entitled to qualified immunity unless (1) "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of [their] alleged misconduct." Pearson v. Callahan, 129 S. Ct. 808, 816 (2009).

The Supreme Court has given this second prong two aspects. The first is whether, based on the "clarity of the law at the time of the alleged civil rights violation," "'[t]he contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The second aspect is whether, based on the "facts of the particular case," a "reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Id. Qualified immunity generally protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Courts need not address these questions in order. Pearson, 129 S. Ct. at 818; Maldonado, 568 F.3d at 269-70. We turn to the second part of the test and specifically whether the right in question was so clearly established as to give notice to

defendants that their actions were unconstitutional in 2002.[20] This is a question of pure law.

This question must be resolved based on the state of the law at the time of the alleged violation. See Brousseau v. Haugen, 543 U.S. 194, 198 (2004). Further, "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)), and "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201 (emphasis added).

Thus, the relevant question in this case is not whether in 2002 the Fourth Amendment generally prohibited the recording of telephone calls. The question is whether, in 2002, public safety employees, like plaintiffs, had a clearly established right under the Fourth Amendment not to have calls made at work recorded.

We hold there was no such clearly established law. There were no Supreme Court cases, no "cases of controlling authority in [plaintiffs'] jurisdiction at the time of the incident," and no "consensus of cases of persuasive authority" showing that plaintiffs' asserted Fourth Amendment rights were clearly

---

[20] Since plaintiffs elected not to pursue their remedies under the federal wiretap act, 18 U.S.C. § 2510 et seq., we need not reach the question of whether the qualified immunity doctrine may be used in defense to a claim under that statute.

established in 2002. Wilson v. Layne, 526 U.S. 603, 617 (1999) (holding that where none of these sources had relevant supporting precedent, the asserted right was not "clearly established"); see also Brady v. Dill, 187 F.3d 104, 116 (1st Cir. 1999).

In 2002, there was no Supreme Court precedent that addressed whether defendants' particular conduct violated the Fourth Amendment. Plaintiffs rely heavily on Katz v. United States, 389 U.S. 347 (1967), which held that the Fourth Amendment generally requires the government to obtain prior judicial sanction before recording calls from a public telephone booth. Id. at 355-59. They likewise cite O'Connor v. Ortega, 480 U.S. 709 (1987), which merely held that an employee had a reasonable expectation of privacy in his office desk and file cabinets that he did not share with other employees. Id. at 718. Neither of these cases address public safety employees' expectations of privacy at work, and neither can be construed to show that defendants' particular conduct was unlawful. This is precisely the kind of "high level of generality" that the Court has held insufficient, Brousseau, 543 U.S. at 200, particularly given the Court's recognition that an individual's expectation of privacy varies within different parts of the workplace and depending upon the nature of his or her work. See O'Connor, 480 U.S. at 716-17.

Nor had any First Circuit case held as of 2002 that the Fourth Amendment was violated if police and fire public safety employers recorded all calls to and from their employees' offices.

There was also no clear consensus among other circuit courts. Indeed, this lack of consensus was explicitly recognized by the one court of appeals to squarely address a factual situation similar to the case at hand. In that case, Blake v. Wright, 179 F.3d 1003 (6th Cir. 1999), the Sixth Circuit held that a police chief was entitled to qualified immunity for his implementation of a system that recorded almost all personal, emergency, and administrative calls at a police station without the police employees' knowledge. It so held because the unconstitutionality of these recordings was not clearly established as a matter of law. Id. at 1010-11.[21] This certainly would not have informed the

---

[21] There was one circuit opinion, Abbott v. Village of Winthrop Harbor, 205 F.3d 976 (7th Cir. 2002), in which a jury found under § 1983 against a police chief and village that recorded police officers' calls. Id. at 977. However, in that case, plaintiffs argued only that the recording of their personal line, and not the emergency and office lines at the station, violated their Fourth Amendment rights. Id. Moreover, plaintiffs' claim of a reasonable expectation of privacy on their personal line in that case was based upon the police chief's initial exclusion of the personal line from the recording system, his explicit announcement to all officers that the personal line would not be recorded, and his subsequent, secret decision to begin recording the personal line for personal reasons unrelated to police work. Id. at 978-99. Because the police chief did not appeal, the court did not discuss qualified immunity at all, let alone whether plaintiffs' rights in this context were clearly established.

In October 2002, another circuit court upheld a jury verdict that a police officer's Fourth Amendment rights had been violated when a specific call he made to his wife was recorded and listened

individual defendants that their specific conduct violated the Fourth Amendment.

Moreover, other circuits' precedents in a line of cases under Title III of the federal wiretap act would have led reasonable officials to conclude that recording all calls into and out of a police station was neither illegal nor unconstitutional.

If under Title III law the defendants could have concluded their actions were not illegal, then they could reasonably have concluded it was not clearly established that the same actions would violate the Constitution. Congress enacted Title III in response to Katz, see Bartnicki v. Vopper, 532 U.S. 514, 523 (2001), and in doing so attempted to provide at least as much protection as the Constitution affords. See Mitchell v. Forsyth, 472 U.S. 511, 531-32 (1985); Dalia v. United States, 441 U.S. 238, 256 n.18 (1979). Further, Title III statutory requirements are relevant to the question of what public safety employees' reasonable expectations of privacy were.[22]

_____

to. Zaffuto v. City of Hammond, 308 F.3d 485, 488-89 (5th Cir. 2002). There, the violation was not recording lines as a general matter, but instead that his particular call was accessed and reviewed. Id. The court also made no finding as to qualified immunity. Id.

[22] To the extent that the district court relied on disputes over the degree of notice of the recordings that defendants gave to plaintiffs to deny immunity, it erred. There was no clearly established law that explicit notice to employees of recording was required in police offices and some law pointed the other way. Amati v. City of Woodstock, 176 F.3d 952, 955 (7th Cir. 1999).

The lead Title III case that defendants relied on for their immunity claims is Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999). There, the court upheld a jury finding that a police department's practice of recording all calls on a line used by employees for both personal and business calls was not a violation of Title III. Id. at 955-56. The court held that the calls fell within the exception for recording "by an investigative or law enforcement officer in the ordinary course of his duties." Id. at 954-55. The court found "[i]t is routine, standard, hence 'ordinary' for all calls to and from the police to be recorded," because the "calls may constitute vital evidence" and can be used to "evaluate[] the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance." Id. at 954. The Amati court further explained it was "irrelevant" whether personal calls on a police department's lines were recorded, holding that "if all the lines are taped, as is the ordinary practice of police departments, then the recording of personal as well as of official calls is within the ordinary course." Id. at 956.

Other courts had also taken the view before 2002 that "the routine and almost universal recording of phone lines by police departments . . . as well as other law enforcement institutions is exempt from the [federal wiretap statute]" and the practice of "routinely and indiscriminately record[ing] all phone

activity in and out of the police department" is "well known in the industry and in the general public." Adams v. City of Battle Creek, 250 F.3d 980, 984 (6th Cir. 2001); see also Abraham v. County of Greenville, 237 F.3d 386, 391 (4th Cir. 2001) (recognizing "the County's need to monitor for law enforcement purposes calls relating to Detention Center inmates and employees"); First v. Stark County Bd. of Comm'rs, No. 99-3547, 2000 WL 1478389, at *4 (6th Cir. 2000) (holding the routine recording of all conversations in a sheriff's office dispatchers' department was protected by Title III's law enforcement provisions and dismissing plaintiffs' constitutional claims).

We need not address the jury's verdict. This is an issue of law on which the district court erred. The individual defendants are entitled to judgment on the basis of qualified immunity.

2. Municipal Liability for the Fourth Amendment Claims Against City of Providence

This leaves the City's Rule 50 motion on the Fourth Amendment claims against it.[23] The City says there is no municipal liability for the recordings because plaintiffs' calls were not recorded pursuant to any official policy or custom. This issue was

_____

[23] Unlike individual defendants, municipalities are not entitled to qualified immunity. Our finding that Vieira and Lennon are entitled to such immunity does not dispose of the issue of municipal liability. Owen v. City of Independence, 445 U.S. 622, 638 (1980).

-32-

preserved.   We review de novo.   Valentin-Almeyda v. Mun. of
Aguadilla, 447 F.3d 85, 95-96 (1st Cir. 2006).   We hold, contrary
to the district court, that the City was entitled to judgment as a
matter of law.

Municipal defendants may be held liable under § 1983 for
actions taken pursuant to an official policy or an official custom
that violated the Constitution.   Monell, 436 U.S. at 694; Young v.
City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).   "A plaintiff
can establish the existence of an official policy by," inter alia,
"showing that the alleged constitutional injury was caused . . . by
a person with final policymaking authority."   Welch v. Ciampa, 542
F.3d 927, 941 (1st Cir. 2008) (internal citations omitted).

Whether an official is a final policymaker is also a
question of law for the trial judge to decide.[24]   Jett v. Dallas
Indep. Sch. Dist., 491 U.S. 701, 737 (1989).   This determination
requires a showing that "a deliberate choice to follow a course of
action [was] made from among various alternatives by the official
or officials responsible for establishing final policy with respect
to the subject matter in question." Pembaur v. City of Cincinnati,
475 U.S. 469 (1986) (plurality opinion); see also Wilson, 421 F.3d
at 59-60 (applying this test).

---

[24]   The district court's instructions to the jury make clear
that the finding of municipal liability rested on the court's
ruling that Vieira was a final policymaker.   Plaintiffs did not
argue that there was some other policymaker.

-33-

Whether an official has this requisite level of specific policymaking authority is a matter of state law. Jett, 491 U.S. at 737. Courts must look to state law, including "valid local ordinances and regulations," for descriptions of the duties and obligations of putative policymakers in the relevant area at issue. City of St. Louis v. Praprotnik, 485 U.S. 112, 125 (1988) (plurality opinion). This does not mean that we look simply to state law labels to determine whether an official is a final policymaker, "[b]ut our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." McMillian v. Monroe County, 520 U.S. 781, 786 (1997). This, too, is a question of law for the judge to decide.

Plaintiffs argue, and the district court agreed, that Vieira was a final policymaker with respect to the decisions to procure and implement the Total Recall system. They say that Vieira was responsible for the RFP and the actual decision to award Expanets the bid. They also say that he had final authority with regards to how the system was implemented. We reject these arguments and hold that Vieira was not a final policymaker in this case.

Both as a matter of state law and in practice, Vieira did not have final policymaking authority over the decision to procure the recording system and award Expanets the bid.

The City Charter clearly states that the Board of Contract and Supply, not the Department of Public Safety or its officials, is the department with "responsibility . . . [t]o make all contracts for purchase of materials, supplies, services, equipment and property on behalf of the city, the price or consideration of which shall exceed five thousand dollars."[25] Charter, art. X, § 1007(c)(1). Moreover, the Board controls key aspects of the bidding process, since bids are "to be submitted, opened and considered in accordance with rules and regulations approved by the board." Id. The Board also has total discretion "[t]o reject any or all bids submitted to it for a specific purpose" if, in its judgment, "the public interest will be best served thereby." Id. § 1007(c)(3).

Although the Commissioner of Public Safety has, through the Director of Communications, responsibility for the "procurement, installation, and proper operation" of "all municipal radio, television, teletype and other associated equipment," id. at § 1001(c), this procurement function is constrained by the Board of Contract's control over the bidding process. The Department of Public Safety can, through the Director of Communications,

---

[25] While the Board's members include the Commissioner of Public Safety, its total membership also includes the Mayor and ten other departmental heads and senior city officials. It does not include the Director of Communications. Charter, art. X, § 1007. Moreover, the Mayor has general authority "[t]o supervise, direct and control the activities of all departments and agencies of city government." Id. art. III, § 302(a).

influence the general substantive parameters of an RFP in these areas, but it cannot, by law, control which vendor ultimately receives the award.

The Board of Contract and Supply, not Vieira, was also responsible in practice for all of the relevant decisions involved in awarding Expanets the bid to install its telephone system, including Total Recall, in the Complex. Uncontested testimony at trial showed that Vieira was one voice among many during the planning meetings and did not single-handedly set the desired parameters for the Complex phone system himself. Although Vieira used those parameters to create the RFP he sent to Alan Sepe, the Acting Director of the Department of Public Property, Vieira did not have final policymaking authority over the RFP. It was only adopted after the Board of Contract and Supply reviewed it and voted on it, and Vieira was not a member of that body.

Nor did Vieira have final policymaking authority over the decision to award Expanets the bid. The RFP itself clearly stated that the Board of Contract and Supply had decisionmaking authority and that the ordinary practice was to award the bid to the "lowest responsible bidder" who met the RFP's specifications. Expanets only received the bid after the Board of Contract and Supply, pursuant to the City Charter, voted to do so.

Plaintiffs claim, and the district court held, that Vieira was nonetheless the final policymaker because he recommended

to the Commissioner of Public Safety and Sepe that Expanets' bid be accepted and both of them deferentially reviewed his recommendation.  That conclusion is contrary to the relevant law.  "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." Praprotnik, 485 U.S. at 130.  It also ignores the fact that the Board of Contract and Supply ultimately voted to award the bid, and there is no argument that the board did not independently review the merits of Expanets' proposal.

As a matter of state law and in practice, Vieira also lacked final policymaking authority over the implementation of the Total Recall system.  The Charter makes clear that the Director of Communications's authority is subsidiary to the Commissioner of Public Safety, who heads the Department of Communications and is ultimately "responsible, through the [D]irector of [C]ommunications, for the complete operation of the department . . . and for the design, procurement, installation and proper operation of all the equipment under its jurisdiction." Charter, art. X, § 1001(c)(2).  "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, [the policymakers] have retained the authority to measure the official's conduct for conformance with their polices." Praprotnik, 485 U.S. at 127.

Vieira also did not have final policymaking authority over the implementation of the Total Recall system in practice. All indications suggest the Total Recall system was activated by Expanets technicians in May 2002 immediately after its installation and pursuant to Expanets' contract with the City. Vieira was also not a final policymaker with respect to the decision to shut the system down. Rather, Police Chief Esserman, when he learned of the system, unilaterally ordered it shut down, apparently without having to consult with Vieira.

There was also no custom or practice for which the City could be held liable, and to the extent the jury's finding of liability rested on that theory, a reasonable person could not have reached that conclusion. Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 71 (1st Cir. 2009). To find municipal liability, we have required that the custom or practice "be so well-settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end it." Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 24 (1st Cir. 2006) (quoting Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997)) (internal quotation marks omitted).

The recordings in this case were neither so widespread nor so well-settled as to be a custom or practice. They occurred at a single building and for a period of eight months. This was different from the City's otherwise-established practice of not

recording calls except pursuant to the policy at the EOC. Nor did plaintiffs show the City's policymaking officials had constructive knowledge of it and yet did nothing to end it. Indeed, when Fire Chief Lanzi learned of it, he had his own telephone lines removed, while Police Chief Esserman, on learning of the recordings, had the Total Recall system shut down. Plaintiffs presented no evidence any other officials knew of the recordings. Nor on appeal do plaintiffs point to any evidence presented that showed a policy or custom was established.

The City is entitled to judgment on the Fourth Amendment claims.

B. <u>State Constitutional Claims</u>

The district court treated the defendants' liability under the state constitutional claims as identical to their liability under the federal constitutional claims. The plaintiffs did not object at trial and do not challenge this approach on appeal. We hold they have waived any objection to disposing of their state law claims based on the disposition of their federal constitutional claims, and judgment must be entered for all defendants[26] on the state constitutional claims as well.

---

[26] Because we have granted qualified immunity under § 1983, there is no reason to believe the defendants are not also entitled to qualified immunity on state constitutional claims. Rhode Island law recognizes qualified immunity. <u>Ensey</u> v. <u>Culhane</u>, 727 A.2d 687, 690-91 (R.I. 1999); <u>see</u> <u>also</u> <u>Hatch</u> v. <u>Town of Middletown</u>, 311 F.3d 83, 90 (1st Cir. 2003).

C.  Pendent State Statutory Claims

Plaintiffs also prevailed at trial on their state law claims for violation of the state wiretap and privacy acts. Defendants appeal.  We start with the City's claim of error of law, that it cannot be sued under the state wiretap act because it is not a "person" within the meaning of the act.  As a result, the City argues, the state wiretap claims against the City should have been dismissed and no damages could be awarded against it.

1.  The City Is Not a "Person" Who May Be Sued Under the Rhode Island Wiretap Act

The district court rejected on summary judgment the claim that the City was not within the scope of the federal wiretap act, Walden, 495 F. Supp. 2d at 265-67, but did not address the City's separate claim that it was not a defendant within the state wiretap act, id. at 271.  The City properly preserved the claim.[27]  This is a pure issue of law, which we review de novo.  Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 45 (1st Cir. 2009).  We hold that the City is not a proper defendant within the scope of the state wiretap act.

_____

[27]  Plaintiffs argue that the City did not preserve the claim at the summary judgment stage or later.  Our own review of the City's summary judgment motion shows that the City plainly presented the argument that the state wiretap law did not allow suit against a municipality because of a difference in wording in the state and federal acts.  Further, the City did raise on its Rule 50 motion the argument that it was entitled to judgment on both of the federal claims and all of the state claims.

The City argues that while the Rhode Island wiretap statute generally mirrors the federal statute, the federal act applies to a broader range of possible defendants than state law does. The federal statute makes any "person" who violates it civilly liable and was amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub. L. No. 99-508 § 103 (1986), to also make any "entity" liable. 18 U.S.C. § 2520(a). The Rhode Island statute instead permits suit only against a "person" and does not include the term "entity." R.I. Gen. Laws §§ 11-35-21(a), 12-5.1-13(a). The City argues that it cannot be sued under the state law because it is not a "person" under the Rhode Island wiretap act.

We apply Rhode Island's rules of statutory construction to interpret this statute. Under these rules, unambiguous language is given its "plain and ordinary meaning," Castelli v. Carcieri, 961 A.2d 277, 284 (R.I. 2008), and for ambiguous text, we look at the "statute in its entirety to determine the intent and purpose of the legislature," Harvard Pilgrim Health Care of New England, Inc. v. Rossi, 847 A.2d 286, 290 (R.I. 2004). Rhode Island's law also dictates that we interpret the state wiretap act by analogy to interpretations of the federal wiretap act, both before and after the 1986 amendment that added the term "entity." See State v. Oster, 922 A.2d 151, 162 (R.I. 2007) (citing federal court interpretations the federal wiretap act to interpret parallel

language in the state provision); <u>State</u> v. <u>O'Brien</u>, 774 A.2d 89, 94-95 (R.I. 2001) (same).

The Rhode Island wiretap act by its terms only provides for suits against "any person who intercepts, discloses, or uses the communications" at issue. R.I. Gen. Laws § 12-5.1-13(a). Further, recovery is "from that person." <u>Id.</u>[28]

The statute in turn defines a "person" as any "individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent, or employee of the United States, a state, or a political subdivision of a state." R.I. Gen. Laws § 12-5.1-1(11). This language makes clear that only "officer[s], agent[s], or employee[s]" of municipal governments are "persons" who may be sued, not municipalities themselves. <u>Id.</u>

Further, the wiretap act's unique definition of the term "person" shows the state legislature did not intend the act to provide for suit against municipalities. Unlike the wiretap act definition, Rhode Island's general definition of "person" for purposes of statutory construction "extends to and includes co-partnerships and bodies corporate and politic," <u>Id.</u> § 43-3-6, which does include the City of Providence, <u>see</u> Charter, Art. I, §

---

[28] The other section plaintiffs sued under is a criminal provision that incorporates a requirement that the recordings be willful and also applies only to "persons." R.I. Gen. Laws § 11-35-21(a). Rhode Island courts use the definitions in § 12-5.1-1 when interpreting § 11-35-21. <u>See</u> <u>O'Brien</u>, 774 A.2d at 94.

Had Rhode Island's legislature wished the act to cover municipalities, it could have ensured it did so specifically by including the phrase "bodies corporate and politic," or using the State's general definition of the word "person."

Our conclusion that municipalities are not "persons" under the state act is reinforced by the material differences in language between the state and federal wiretap acts regarding who can be held liable. The equivalent provision in the federal wiretap statute, 18 U.S.C. § 2520(a), was amended by the ECPA to add to the statutory definition of those who could be held liable the term "or entity." Pub. L. No. 99-508 § 103 (1986). This amendment, courts agree, is the only possible basis for holding municipalities liable under the federal act and even so, federal courts disagree as to whether even the term "entity" includes a municipality. Compare Adams, 250 F.3d at 985; Williams v. City of Tulsa, 393 F. Supp. 2d 1124, 1132 (N.D. Okla. 2005), with Abbott, 205 F.3d at 980; Anderson v. City of Columbus, 374 F. Supp. 2d 1240, 1244-45 (M.D. Ga. 2005). And it is clear that Congress did not intend to define the term "person" to include municipalities in the federal statute.[29] Abbott, 205 F.3d at 980; cf. Adams, 250 F.3d

---

[29] The federal statute defines a "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6). Although this language varies slightly from that of § 12-5.1-1(11), we conclude that both clearly exclude municipalities from the definition of persons.

-43-

at 985.  This again indicates that the Rhode Island statute does not permit a cause of action against the City.

The City of Providence is entitled to dismissal of the claims against it under the state wiretap law.  Because plaintiffs elected to pursue remedies under the state law to the exclusion of federal law, all claims under the state wiretap act against the City must be dismissed.

2.  <u>Trial Error from the Jury Verdict Forms Affecting All Remaining Claims</u>

This leaves the jury verdict finding Vieira alone liable on the state wiretap claims.  Plaintiffs were awarded $526,700 in statutory damages under § 12-5.1-13 and $1 each in nominal damages under § 11-35-21.  Also remaining is the verdict against all three defendants, for which each plaintiff received $1 in nominal damages.  How we resolve these issues on appeal affects the award of attorney's fees against the defendants.

Defendants argue that the two jury verdict forms were improper because they did not require the jury to make separate findings as to each plaintiff against each defendant for the state wiretap act and the state privacy act claims.[30]  Defendants preserved this issue with timely objections at trial.

_____

[30]    Although the same critique applies to the verdict forms for the constitutional claims, our earlier findings on qualified immunity and municipal liability make it unnecessary for us to reach that issue.

-44-

"A verdict form must be 'reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment.'" Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004) (quoting Sheek v. Asia Badger, Inc., 235 F.3d 687, 699 (1st Cir. 2000)). We examine the verdict forms, along with the court's jury instructions, "to determine whether the issues were fairly presented to the jury." Id.; Sheek, 235 F.3d at 699. Our review is de novo. Sanchez-Lopez, 375 F.3d at 134-35.

Plaintiffs' claims under the state wiretap and privacy acts, as instructed to the jury, required individual findings with respect to each plaintiff against each defendant. The jury verdict forms repeatedly failed to differentiate between the plaintiffs on various counts, forcing the jury to choose between finding for all or none of the plaintiffs and relieving individual plaintiffs of the burden of proving their own cases. We hold that this prevented the wiretap and privacy claims from being fairly presented to the jury.

a. Plaintiffs' Claims Had to be Proved Individually

We assume arguendo that the instructions, as worded, adequately presented the law and instead focus on what those instructions required plaintiffs to prove.

Under the state wiretap act claims, plaintiffs had to show that their telephone calls had been intercepted, R.I. Gen.

-45-

Laws §§ 11-35-21, 12-5.1-13, and that defendants had done so intentionally.[31] Thus, the defendants could not be liable to any plaintiff whose calls they did not intentionally record. Cf. Reynolds v. Spears, 93 F.3d 428, 432 (8th Cir. 1996) (affirming summary judgment for defendants on a similar provision of the federal wiretap act, 18 U.S.C. § 2520(a), when plaintiffs relied solely on a jury finding for a co-plaintiff to show their calls were intercepted and provided no evidence of their own).

Defendants also had defenses that the jury had to consider. The first, which the court only allowed for one of the two wiretap claims, under § 12-5.1-13, was a law enforcement defense. Under the wiretap act, defendants had a defense for intercepted calls on "[a]ny telephone . . . being used by . . . an investigative or law enforcement officer in the ordinary course of his or her duties." R.I. Gen. Laws § 12-5.1-1(7)(i). As instructed by the court, this required a finding as to whether defendants were law enforcement officers and whether or not the calls were recorded in the ordinary course of duties.[32] If nothing

_____

[31] Plaintiffs raised state wiretap claims based on two different statutory provisions. Count Four was under R.I. Gen. Laws § 11-35-21, and Count Six was under R.I. Gen. Laws § 12-5.1-13. The court instructed the jury separately on these claims, but it provided the jury with forms that did not distinguish between the two claims and addressed them simultaneously.

[32] Although we do not ultimately decide defendant Vieira's argument that the court incorrectly applied the law enforcement exception to the state wiretap act, we question the court's

else, the jury would have had to determine whether each defendant was a law enforcement officer and whether the individual plaintiffs' telephone calls were recorded in the ordinary course of law enforcement duties. Cf. Amati, 176 F.3d at 955 (considering whether recordings on a specific police department private line fell within the equivalent federal law enforcement exception).[33]

Finally, for the wiretap claim under R.I. Gen. Laws § 12-5.1-13, plaintiffs had to individually show the number of days that their calls had actually been recorded for purposes of calculating statutory damages. See id. § 12-5.1-13(a)(1).

On the privacy act claim, each plaintiff had to establish both that he or she had an objectively reasonable expectation of, or entitlement to, his or her calls being private, id. § 9-1-28.1(1)(i), and that defendants's recording of calls actually violated that expectation, id. § 9-1-28.1(b). Especially because the evidence at trial was that plaintiffs used their phones for varying purposes and under varying circumstances, both of these

recitation of the law, which could exclude government employees responsible for operating otherwise legal recording equipment simply because they are not police officers. Cf. United States v. Lewis, 406 F.3d 11, 16-18 (1st Cir. 2005) (finding a state telephone system administrator at a prison to be a law enforcement officer).

[33] The second defense presented to the jury was that defendants could not be liable for the recording of calls by any plaintiffs who consented to the recordings. This defense required the jury to decide whether any of the individual plaintiffs had consented. The court required the jury to make individual findings on this defense and so we do not address it further.

elements required individualized findings. Cf. O'Connor, 480 U.S. at 718 (holding under the analogous Fourth Amendment right to privacy that "whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis"); Vega-Rodriguez v. P.R. Tel. Co., 110 F.3d 174, 179 (1st Cir. 1997).

b.  Lack of Individuation in the Verdict Forms Prevented the Jury from Making Essential Findings

The jurors were given two verdict forms, one for the 116 Walden firefighter plaintiffs and one for the nineteen Chmura police plaintiffs.  The forms addressed the state wiretap and privacy act claims similarly.

For the state wiretap act claims the verdict forms asked the jury whether each defendant--Vieira, Lennon, and the City-- "sought to intercept or procured another to intercept any of Plaintiffs' telephone calls made or received at the Providence Public Safety Complex." (Emphasis added).  The forms allowed the jury to find for each defendant or for all plaintiffs against each defendant.

The verdict forms then presented the defenses.  For the law enforcement defense, the forms only gave the jury the choice of finding for all plaintiffs or for all defendants and made no distinction as to types of calls.

The forms next instructed the jury, if it found for plaintiffs on the previous questions, to determine how many days between May 23, 2002, and February 10, 2003, each plaintiff had

-48-

established by a preponderance of the evidence that he or she had telephone calls to or from the Complex that were recorded. Each verdict form then listed plaintiffs' names with a space to provide a number of days.

The verdict forms for the privacy act count only asked the jury to find either individually for each defendant or for all plaintiffs against each defendant.

These verdict forms did not fairly present the issues to the jury because they deprived the jury of the ability to differentiate between plaintiffs on nearly every element. Instead, the forms assumed that the only meaningful distinction among the plaintiffs was whether they were part of the Walden firefighter or Chmura police groups, requiring the jury to find for all members of the groups, or for none of them. While findings for all plaintiffs might be permitted in a class action, this case was not a class action and there were no findings as to commonality of claims. See Fed. R. Civ. P. 23(b)(3) (allowing plaintiffs to proceed as a class "if the court finds that the questions of law or fact common to class members predominate").

Under the wiretap act, the forms required the jury to find for all plaintiffs in each group if "any" of them had their calls intentionally recorded, even if the jury found that only some of the plaintiffs met their burden of showing their calls were intentionally recorded. Thus, the jury found the defendants liable

-49-

to all 116 Walden plaintiffs despite the jury's apparently inconsistent factual finding that seventy-one of them had failed to prove that their calls were recorded on any days.[34]

Further, the forms prevented the jury from making essential findings on defendants' law enforcement defense, even though defendants played different roles in the recordings and plaintiffs' testimony made clear that their use of the telephone system varied.[35] The jury could very well have found that some lines or calls were being recorded in the ordinary course of law enforcement but that others were not. The all-or-nothing structure of the verdict forms made it impossible for the jury to make this distinction.

On the privacy act, the lack of differentiation in the forms prevented the claim from being fairly presented to the jury because the forms forced the jury to treat plaintiffs in each group as having the same expectation of privacy. The evidence at trial showed that plaintiffs in each group used their phones to make

---

[34] The forms similarly required the jury to make a finding of the number of days on which calls were recorded for plaintiffs even if plaintiffs failed to prove that the recording of their calls was intentional, as may well have been the case among firefighters who made calls on the personal line.

[35] Among the Chmura plaintiffs were police officers who used their telephones for police work, civilian Police Department employees who answered calls from complainants, and employees who only made calls on administrative matters. Among the Walden plaintiffs, there were internal calls between fire stations that directly implicated the functioning of the Department and calls on the firefighters' personal line.

widely differing types of calls under differing circumstances, and the jury could have found that their expectations of privacy differed accordingly.[36] Further, the jury's inability to make individual findings, as under the wiretap claims, forced the jury to find for all plaintiffs even if not all of them proved their calls were recorded, as was the case with seventy-one of the Walden plaintiffs.

The errors were not harmless.[37] The error with the forms affects both the awards against Vieira under the state wiretap act and the award against all three defendants under the privacy act; it requires a remand for a new trial on both.[38]

---

[36] The Chmura plaintiffs made and received calls on a number of lines for a number of purposes, including as part of investigations, answering questions from family members of suspects, addressing human resources concerns, or simply making personal calls. The Walden plaintiffs had similar differences.

[37] We realize there were 135 individual plaintiffs and that construction of an appropriate form would take some effort. But plaintiffs' claim such a form would take 1,000 pages is simply untrue.

[38] Lennon argues that the jury finding in Count Five, that she violated the privacy act, R.I. Gen. Laws § 9-1-28.1, was inconsistent with the verdict that she was not liable under Counts Four and Six, under the state wiretap act. Even assuming Lennon preserved the claim, the remedy for inconsistent civil verdicts that cannot be reconciled is a new trial, see Davignon v. Hodgson, 524 F.3d 91, 109 (1st Cir. 2008), and she is entitled to a new trial on other grounds.
We do not reach Lennon's claim on the sufficiency of the evidence.

D.  <u>Further Proceedings</u>

There are other claims that we need not address, including defendants' claims of error in the court's jury instructions and evidentiary rulings.  Our disposition moots the plaintiffs' appeal.

Because plaintiffs are no longer prevailing parties, the award of attorney's fees is vacated.  The defendants' appeal from the amount of the award is moot.

On remand the district court should dismiss all federal claims,[39] the state constitutional claims, and the state wiretap claims against the City with prejudice. The court should dismiss without prejudice the state wiretap claims against Vieira, and the privacy act claim against the two individuals and the City, so the claims can be brought in state court, which is the preferred forum for any interpretation of state law issues remaining.

Accordingly we vacate the jury verdicts and direct entry of judgment of dismissal with prejudice of all federal claims and of the state wiretap claim against Lennon.  We direct entry of dismissal without prejudice to proceedings in the state courts on the state wiretap claims against Vieira and the state privacy act

---

[39]     The dismissal of the federal wiretap act claims was based on an election of remedies.  The parties have not briefed the issue of whether the federal wiretap claim can be reinstated on remand given the basis for the dismissal was the election of remedies. However, the election of remedies chosen by the plaintiffs was to their advantage, and there is no reason to think even if the law gave them a choice, that they would choose otherwise.

claims against all three defendants.  The award of attorney's fees is vacated.  No costs are awarded on appeal.

So ordered.